SPERRY MFG. CO. v. J. L. OWENS CO.

(Circuit Court of Appeals, Eighth Circuit. October 14, 1901.)

No. 1,415.

1. PATENTS—INVENTION—EVIDENCE OF UTILITY AND EXTENSIVE USE.

To entitle evidence of the utility of a patented machine and of its extensive use to consideration on the question of invention, it must clearly show utility superior to that of other like machines, and a more extensive use.

2. SAME—FANNING MILLS.

The Sperry patent, No. 267,032, for a fanning mill, shows only a combination of old appliances and devices previously used in such mills, in a manner which produces only old results and evolves no new functions, and is void for lack of patentable invention.

Appeal from the Circuit Court of the United States for the District of Minnesota.

For opinion below, see 96 Fed. 975.

A. C. Paul (C. G. Hawley, on the brief), for appellant.

Charles S. Cairns, for appellee.

Before SANBORN and THAYER, Circuit Judges, and ADAMS, District Judge.

ADAMS, District Judge. This was an action brought by the appellant, which was complainant below, against the appellee, which was defendant below, for infringement of letters patent of the United States No. 267,032, for improvements in grain cleaning and separating machines. The invention described in the specification consists of a certain combination and arrangement of screens and conductors in the usual fanning mill, by which the separation of different materials fed into the machine is effected, and the same, when separated, are delivered outside of the machine so as to reduce the labor attending it. The peculiar arrangement of the screens and conductors is substantially as follows: The feed hopper is located on the top of the machine to receive the material to be treated. Underneath the hopper, and inclining downward from it towards the back of the machine, is a screen, G, having a mesh of suitable size to permit the passage of large and perfect grain like wheat, and terminating at its lower end in a continuing screen, J, having a coarser mesh, through which large grain, like oats, can freely pass, and over which straw and chaff can be discharged at the back end of the machine. Beneath the upper part of screen, G, is located in the same shoe or shaker, another screen, K, inclining in the opposite direction towards the front of the machine. The lower end of screen, G, projects beyond the upper end of the reverse screen, K, so that what is discharged through the lower portion of screen, G, falls beyond or outside of the reverse screen, K. Screen, K, has a finer mesh than screen, G, so as to arrest the wheat or other large grain which falls through screen, G, upon it, and carry it down the incline to be deposited, thoroughly cleaned and separated, in a receptacle at the foot or front of the machine. The shaking motion of screen, K, with its finer mesh, permits the grass seeds and other impurities which fall upon it from screen, G, to pass through and fall upon an inclined conducting board, L, which is attached to the shoe immediately under and parallel with screen, K. The shaking motion of this board carries the grass seed and other impurities down the incline into a proper receptacle under the machine. Under the coarser screen, J, is located an inclined spout, D, running transversely the machine. Through this coarser screen, J, and into this spout, D, is delivered the large grain, like oats, which by reason of its size cannot pass through the mesh of screen, G; and when so delivered it passes down the incline of the spout, and out at the side of the machine into a receptacle provided for that purpose. At the upper end of screen, K, and beneath the lower end of screen, G, is

located spout, E, running transversely the machine, and inclining to the side of the machine opposite the exit of spout, D.

The patentee in his specification says:

"Of the material which passes through the upper screen, * * * that portion escaping near the tail will be found to contain a greater or less percentage of impurities, requiring to be again passed through the machine."

For the purpose of capturing this mixed grain, spout, E, is located at the upper end of screen, K, which, by being slid along grooves endwise, can be so adjusted as to cover spout, E, to a greater or less extent, as circumstances may require, according to the character and quality of the grain, and its impurities, which are being treated. By this device the patentee claims he is able to accomplish a perfect separation of the cleaned and uncleaned grain, and deliver the cleaned grain, like wheat, over the inclined screen, K, the uncleaned grain into and through spout, E, to the side of the machine ready to be returned to the hopper for a second treatment through the machine, and the oats which pass through screen, G, into trough, D, which delivers them at the opposite side of the machine. The result of the process is claimed to be the thorough separation of wheat, oats, and mixed grains. The claims of the patent alleged to be infringed are as follows:

"(1) In combination with a hopper, the upper grain-receiving screen, G, the lower and coarser screen, J, the adjustable lower screen, K, inclined in the opposite direction, and the spouts, D and E, arranged, the former beneath screen, J, and the latter beneath the screen, G, as described. (2) The combination of the screen, G, the coarser screen, J, adapted to receive the tailings therefrom, the spout, D, located beneath the screen, J, a second spout, E, inclined in the opposite direction, and arranged to receive the material passing through the lower end of the screen, G, and the bottom screen, K, inclining in the opposite direction from the upper screen, G, and arranged to receive the material passing through the upper end of said screen. (3) In a grain separator, the vibratory shoe or shaker, B, the two oppositely inclined spouts, D and E, attached to the foot of said shoe and partaking of its movements, in combination with the screens, G and J, and longitudinally adjustable screen, K, arranged in the relative positions described. (4) The combination of the screen, G, coarser screen, J, spouts, D and E, longitudinally adjustable screen, K, and board, L, arranged with respect to the inner spout and the adjustable machine as described and shown."

The main defense relied upon is that complainant's patent is void for want of patentable novelty, and in support of this defense a large number of patents are pleaded as anticipations. These patents clearly show that in 1882, when complainant's patent was applied for, the field of invention in this art had been very exhaustively worked, and was at that time very narrow. Screens or sieves properly adjusted in a vibratory frame so as to separate fine from coarse grains and free them from impurities, and conducting spouts so applied as to carry off the grains and impurities when separated, are devices which have been for a long time familiar to all. So true is this that the patentee was compelled by the patent office to disclaim any novelty in either of them. He says in his specification:

"I am aware that machines have been variously constructed with double conducting spouts therein, said spouts inclined in opposite directions. I am also aware that coarse and fine screens have been employed in various combinations under various arrangements, and I make no claim thereto."

Under this state of facts, the patentee's invention must rest solely on the proposition that he has discovered a new arrangement or combination of old and familiar elements whereby a new and useful result is secured. Seymour v. Osborne, 11 Wall. 516, 20 L. Ed. 33; Gould v. Rees, 15 Wall. 187, 21 L. Ed. 39; National Hollow Brake Beam Co. v. Interchangeable Brake Beam Co., 45 C. C. A. 544, 106 Fed. 693–707. We are thus led directly to the first inquiry,—whether the patent in suit shows any new combination of old elements, within the meaning of the rule just announced, and within the accepted meaning of the word "new" in patent law, namely, patentable or inventive novelty. Our attention has been called to a large number of patents which contain some one or more of the elements of the patent in suit. These have thrown much light on the state of the art, and have been duly considered in reaching the conclusion arrived at; but we do not deem it profitable to specially advert to many of them, because we find, in those to which specific reference will be made, sufficient material to control the judgment of the court. The patent issued to Elijah Youngs, dated June 30, 1863, and numbered 39,090, was for a new and improved grain separating apparatus. It presupposed the existence and use of the ordinary fanning mill, and relates chiefly to the arrangement of sieves and screens for the separation of different kinds of grain. In that patent is found the upper screen of the patent in suit, made of two sections: (1) The perforated plate forming the upper end; (2) the wire gauze or screen, E, forming the lower end. Beneath this upper screen is found the inclined screen, adjustable in grooves, corresponding to the reverse screen, K, of the patent. Plate, F, underneath the wire gauze, E, or the "chess box" placed beneath the rear end of screen, K, corresponds to spout, E, of the patent. The adjustability of screen, K, in its grooves serves the same purpose in effecting a perfect separation of the cleaned from uncleaned grain as the similar provision of the patent in suit. The patentee, Youngs, says:

"A small portion of oats mixed with grains of wheat which owing to lightness or other causes have not fallen through the upper part of the sieve will fall through the meshes near the rear end of the sieve. This mixed portion either falls upon plate, F, which, if perforated, acts as a second sieve, or it falls in the direction of the mingled red and black arrows past the rear end of the screen, K, which has been adjusted by sliding it forward in direction of black arrows sufficiently to allow all the impure grain to fall past it."

The patentee, Youngs, further says, in describing the operation of his machine, as follows:

"It will now be clearly seen that the grain is divided in three separate and distinct parcels: First, that portion consisting of pure, sound wheat, which, passing through the plate, D, and upon portion of the wire gauze, falls upon the adjusted screen, K, and is received in its proper receptacle at the lower or front end of the same, as shown by the black arrows; second, that portion of pure oats which passing over the rear end of the sieve, as seen by red arrows, is received and secured in any desirable manner; third, that portion of mixed grain which passes through the meshes of the sieve nearest the rear end of the same, and is caught upon the plate F, or falls into the chess box placed beneath the rear end of screen, K, and shoe, as shown by

the mingled red and black arrows. This latter portion may be placed in the hopper and passed again through the mill to secure further separation."

From the foregoing analysis of Young's patent, it appears that he employed substantially the same combination of elements, with the exception, possibly, of the provision for screening and conducting away the oats, which will be hereafter considered, and produced the same three general results as are claimed for the patent in suit. The wheat passes through the upper portion of the upper screen, and falls upon the reversely inclined screen, and finds its exit at the front end of the machine, in both patents alike. The mixed grain, which falls through the meshes nearest the rear end of the sieve or screen, is conducted into a chess box located underneath, ready for the repeating process, which is accomplished by substantially the same devices in both patents. There being nothing new, as admitted by the patentee, in the spouts, the substitution of a chess box or any other convenient receptacle for the spout is of no significance. The arrangement for adjusting the end screen so as to allow all the impure grain to fall past it, and thus separate the cleaned from the uncleaned wheat, is substantially the same in both patents. So far, both in the mechanism and in the results achieved by its operation, the two patents present the same invention.

But it is earnestly contended by counsel for the appellant that there is found in Youngs' patent no provision for screening the oats or conducting them away from the machine, like those which are found in the patent in suit, and this contention has received our serious consideration. It is true, there is no specific provision made in Youngs' patent for screening the oats through a larger mesh located at the lower end, and in continuation of the upper screen; but the oats, according to Youngs' patent, pass over the rear end of the sieve, and are "received and secured in any desirable manner." This is the direction of the patentee in his specification. This general direction is equivalent to an instruction to any one desiring to practice the invention of Youngs' patent to adopt any known method of receiving and securing the oats, or any new method which ordinary skill in the art would suggest. By reference to prior patents it is found that an old method existed. One had been specifically pointed out in several of them. In the Higley patent, No. 33,838, of date December 3, 1861, is found a nest of sieves, e, f, g, inclining rearwardly from the mouth of the hopper. Higley says in his specification as follows:

"The back end of these sieves empty into the inclined troughs, A' B'. * * * Trough, A', is covered with a sieve for the purpose of separating the oats that escape over the sieve, e, from straw and other refuse matter; the oats passing out of the same spout with those which pass through the sieves; the straw and other refuse matter passing out of the trough."

Higley, in his second patent, of date June 7, 1864, No. 43,026, also distinctly points out the use of a spout under a large screen to carry off oats which would pass through the screen. He says in his specification:

"The grain passes from the hopper through screens, 4 and 5, and falls upon f, where the wheat falls through, and larger seeds, as oats, pass over and through the screen, 6, and fall into and are discharged through a spout, A'."

A more suggestive reference is found in the Ehle patent, of date August 7, 1866, No. 56,912. Here, like similar provisions in many other patents, there is an inclined screen or sieve, called "perforated screen board, J," over which the grain first flows from the hopper. The straw, chaff, oats, light grain, etc., pass down along the board, J, to its lower edge. "At this point," says the patentee, "the oats, light grain, and the heavier parts of straw drop down upon the sieve, P', whence the straw, etc., pass out of the mill; but the oats and light grain pass through into the trough, R, whence they pass through the spout into bags attached to the outer end of the spout."

In the light of these patents, and several others to which specific attention need not be called, it is apparent that at the time Youngs secured his patent the method of driving oats, found in grain, over a sieve of greater mesh, so as to permit it to pass through and into a receptacle leading out of the machine, was not only a desirable manner of receiving and securing it, but a well-known and ancient manner of doing it,—so well known, in fact, that it could be readily read into Youngs' patent, and comprehended within the provision there made for passing the oats over the rear end of the sieve, and "receiving and securing it in any desirable manner." Any one skilled in the art, possessing knowledge which must be imputed to him of the devices of the Higley and Ehle patents, would in 1882 readily and almost irresistibly, in our opinion, have seized upon the devices there pointed out to make provision for separating the oats and chaff which come over the end of the screen of the Youngs' patent,—especially so when Youngs instructed the public in such suggestive language that they might adopt out of the many obvious expedients some desirable one for receiving and securing the oats. Such being the case, there was no inventive skill displayed by the patentee of the patent in suit in specifically calling for a coarser mesh in the lower end of his screen, G, so as to permit oats to pass through the same into a receptacle located under it. The conducting board, L, located under the upper part of reverse screen, K, in complainant's patent, which is not shown in Youngs' patent, is, in our opinion, an obvious device for capturing the small grass seed which falls through screen, K, and conducting it to a convenient receptacle. The prior art as disclosed in the Burr patent of date December 16, 1862, as well as in several others to which our attention is called, clearly taught the function of this device, and any person at all familiar with the operation and prior use of fanning mills would in 1882 have readily resorted to it as a suggestion of common mechanical expediency.

It results from the foregoing that the patentee of the patent in suit neither discovered a new combination of old elements, nor produced any new and useful result, but, on the contrary, practically adopted the combination shown in the Youngs patent, with the addition only of certain mechanical contrivances, involving no in-

ventive skill, but obviously adopted from the prior art, and, in the main, broadly suggested by Youngs, and at best produced only the results which Youngs distinctly pointed out.

So far we have treated the patent in suit as if it clearly contemplated the separation and cleaning of oats when grown together with wheat, and in so doing have given to the complainant the most favorable construction that can possibly be placed upon the patent sued on. We have met the argument of complainant's counsel to the effect that the patent in suit was intended to provide a method of handling and separating succotash; that is, wheat and oats when grown together. But a careful scrutiny of the patent itself discloses that the mind of the inventor was not particularly directed to this purpose. The separation of wheat from oats is nowhere specifically suggested, and in point of fact the word "oats" nowhere appears in the specification of the patent. The mind of the inventor was obviously engaged upon the principal object of providing a means for separating and cleaning one certain kind of grain. For example, he says in describing the operation of the machine as follows:

"The straw, chaff, and heavy materials are retained upon the surface of the screen, G, and passed over the same onto the screen, J, which in turn carries them over the spout, D, and discharges them from the machine. That small portion of large grain which may be carried with the chaff and straw over the surface of the screen, G, will pass through the coarse screen, J, at the foot, and be received in the conducting spout, D."

It is altogether likely that the words "large grain," here employed, refer to the same object as the words used by the patentee in the immediately preceding context. He there says:

"The large and perfect grain, accompanied by small impurities, will pass mainly through the screen, G, to the surface of the lower screen, K."

The words "large grain," as employed in the first excerpt from the specification above quoted, probably refer to the overgrown grains, which by reason of their size could not pass through the meshes of the screen, G; and the two portions of the specification, taken together, disclose the patentee's primary meaning to be that although the large and perfect grain will mainly pass through screen, G, small portions of the same, which are likely to be carried along with the chaff and straw, will pass through the coarser meshed screen, J, and be carried off through spout, D. It is sufficient for the purpose of this opinion to say that, if this interpretation of the patent is correct, it affords additional reason for the conclusion already reached and stated.

It was seriously contended in argument that complainant's machine was of superior utility, was the first that successfully separated wheat from oats, and had, by reason of its superiority, gone into very general use; and counsel urge that from these facts patentable novelty should be accorded to the invention, as one producing a new result, in that it produced the old result in a "more facile, economical, and efficient way." National Hollow Brake Beam Co. v. Interchangeable Brake Beam Co., supra. It is true, when invention is doubtful, facts like those adverted to, if they

exist, often turn the scales; but in this case it cannot, in the light of what has already been said, be conceded that the issue of invention is at all doubtful. In the next place, a careful and critical reading of the evidence found in the record fails to disclose with any degree of certainty that complainant's machine is either superior to others, or that it has gone into any more general use than others, or that it was the first to successfully separate oats from wheat. The evidence relating to superior utility is chiefly to the effect that complainant's mill had a good general reputation, but in connection with this kind of testimony it clearly appears that there were several other mills used for separating succotash that had equally as good reputations. The evidence relating to general use is also unsatisfactory. Complainant's secretary says that during the last seven years his company has sold in the neighborhood of 2,000 mills. Complainant's president says that during the lifetime of the patent, which has now expired, some 6,000 or 7,000 mills have been sold; but neither of these witnesses furnishes any data to show the proportion of their machines sold to all the machines sold. In like manner, also, the proof that complainant's machine was the first to successfully separate oats from wheat is uncertain and evasive. This proof is confined to a single question put to witness Sperry, who is president of complainant company, and also the patentee of the patent in suit, and to his answer thereto, as follows:

"Q. Do you claim, Mr. Sperry, that you invented the first machine for cleaning succotash, as you call it? A. I claim that I made the first mill that cleaned it successfully, but there were other mills before I made any that they claimed did clean succotash."

Testimony of this general, uncertain, and equivocal character is of no value whatsoever on the issue of invention, and certainly in this case cannot disturb the conclusion reached on that issue.

Several other propositions were urged upon us by counsel, and have each received due consideration, but the conclusion already reached dispenses with the necessity of any reference to them in this opinion.

The decree of the circuit court must be affirmed.