TROY LAUNDRY MACHINERY CO., Limited, v. COLUMBIA MFG. CO.

(District Court, E. D. Pennsylvania.  November 12, 1914.)

No. 1111.

1. PATENTS (§ 46*)—VALIDITY—UTILITY OF DEVICE.
   Both the constitutional and statutory provisions relating to the granting of patents emphasize the requirement that an invention, to be patentable, must be useful, and, to entitle a patent to protection, it must appear that the device is operative.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 54, 55; Dec. Dig. § 46.*]

2. PATENTS (§ 49*)—SUIT FOR INFRINGEMENT—EVIDENCE.
   Evidence merely that the owner of a patent has made, but has ceased to make, the patented device, is not admissible as tending to prove its inutility.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 59–62; Dec. Dig. § 49.*]

3. PATENTS (§ 112*)—UTILITY OF DEVICE—PRESUMPTION FROM GRANT OF PATENT.
   While the action of the Patent Office, in granting a patent, does not render the question of the utility of the patented device res judicata, it is entitled to weight on that question.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 162–165; Dec. Dig. § 112.*]

4. PATENTS (§ 49*)—SUIT FOR INFRINGEMENT—EVIDENCE.
   The fact that neither a patentee nor a subsequent owner of the patent has ever tried out the invention does not carry any implication that the device is a useless one, but it brings such owner in a suit for infringement within the rule that where a fact is in dispute, and one party has the means of producing evidence that would have a convincing bearing, but fails to produce it, the court is justified in giving the fullest weight to the opposing proofs.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 59–62; Dec. Dig. § 49.*]

5. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—DRY-ROOM HANGER.
   The Bartholomew patent, No. 921,722, for a dry-room hanger, *held* void on the ground that the device shown is inoperative; also *held* not infringed if valid.

In Equity.  Suit by the Troy Laundry Machinery Company, Limited, against the Columbia Manufacturing Company.  On final hearing.  Decree for defendant.

Wm. Steell Jackson, of Philadelphia, Pa., and George L. Wilkinson, of Chicago, Ill., for plaintiff.

W. H. C. Clarke, of Washington, D. C., for defendant.

DICKINSON, District Judge.  To discuss or even refer to the facts bearing upon the special features of this case would give inordinate length to this opinion.  These facts are found and stated in the special findings.

The plaintiff is the owner by assignment of letters patent No. 924,-722, granted June 15, 1909, for a dry-room hanger, its proprietary right in which, it asserts, the defendant has infringed.  The case for the plaintiff on its broad merits is not an appealing one.  What it has

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

is, not a device, but a drawing of a device, by which plaintiff is unwilling to stand as embodying the invention claimed. There is no evidence that any such device was ever in use. There is no evidence (except the stipulation referred to later) that any device was ever made, except one made to serve as an exhibit model. There is nothing in the case from which it could be found that the owner has ever made use of this invention, or put it upon the market, or ever intended so to do. The defendant company uses dry-room hangers in its business. Its employés devised and constructed a form of hanger, its use of which is sought to be enjoined. This hanger is admittedly operative and superior to anything even remotely suggested in plaintiff's letters patent.

The practical effect of a ruling in plaintiff's favor would be, not only to prevent defendant from using its own device, but to turn the ownership and control of it over to the plaintiff. In a proper case for the awarding of an injunction, such a hardship is more apparent than real, for the reason that a patentee cannot, of course, be deprived of the exclusive use of his invention merely because some one had subsequently improved upon it; and, if the improver does not patent his improvements, the first patentee may use them. Moreover, the courts cannot deprive a plaintiff of his property, nor deny to him a right or a remedy which lawfully belongs to him because not in sympathy with the use which he makes of his own. It is a reason, however, for requiring him to prove his right and would be a reason for withholding, in a proper case, not his legal rights or legal remedies, but those superlegal remedies which are awarded, if at all, not of right, but of grace.

The device under discussion is essentially a traveling clothespin. The course of its travels is confined to a room artificially superheated. This is the dry-room in which the laundried articles are dried out. The hanger feature is that the device is attached to and suspended from an endless chain, by which it is carried around the room and through the superheated air until the article is dried. The hanger must be so constructed that the articles may be easily inserted between the gripping jaws, which will hold them suspended until the drying process is complete, and then permit them to be automatically dropped in the receptacle provided for them. The plaintiff's invention was intended to meet these requirements. The defendant's device does meet them.

[1] This brings us directly to the defense which we have analyzed, and will discuss in a somewhat different order from that in which presented. The first feature is lack of utility. The purpose declared by the Constitution as the motive for conferring power upon Congress to grant exclusive proprietary rights, and the language employed by Congress in prescribing the conditions upon which these rights are given, laid a like emphasis upon the useful. The power is conferred "for the purpose of promoting the progress of science and the *useful* arts." The right is given to him whose invention or discovery is "new and *useful*," and the commissioner is to issue the letters patent only if it shall appear "that the same is sufficiently *useful* and important." This invention is of no use, unless the device embodying it is operative.

[2] Here we must make a short diversion to discuss the question of the admissibility of some evidence offered by the defendant bearing upon the fact of utility. This was excluded. In deference to the urgency with which the offer was pressed, the ruling was modified to the extent that the evidence was permitted to go upon the record to be considered if relevant, but not considered otherwise. The evidence was in the form of a stipulation admitting two facts. One was that the plaintiff had made devices as described in the letters patent. The other was that they had ceased to manufacture. The deduction from these facts to be drawn was that the device was inoperative. This involves a non sequitur. It is to be observed that there was no offer to follow up this evidence with proof of the further fact that the discontinuance was due to a failure of the device to work. This would have been an admission of inutility. It is obvious that a mere cessation of manufacture might have been due to something which had no relation to the merits of the device. The evidence was properly excluded and has been disregarded.

[3] The evidence for the plaintiff consisted of the letters patent and the opinion expressed by plaintiff's expert. Every patented device bears the indorsement of the Patent Office that it, among other things, is "useful." For obvious reasons a working rule cannot be made out of the proposition that the findings of the office are within the res adjudicata principle. Nevertheless, such a finding should carry with it something more than a bare prima facie. The Patent Office is a co-ordinate branch of government. The courts owe an attitude of respect toward the opinions which are expressed in the grant of letters. Where the office had before it all that is before the court, such opinion is entitled to have accorded it all the force which is the accompaniment of judgments which, although not binding, are informative and persuasive. We have before us, however, what the Patent Office did not have, that the only persons who put the operativeness of this device to the test of actual use and trial found it would not work. The plaintiff has also in its favor the opinion of its expert. For the views of this witness we have more than the formality of respect. In all his testimony he was clear, candid, and fair, not yielding, of course, anything which belonged to the side on which he was called and carrying everything which could be urged in its favor as far as it could properly go, but yet recognizing also what he owed to his other profession of engineering. All of his testimony carried weight.

[4] There was, upon the other side, the opposing view of a like expert witness for the defendant. In addition to this, there was the testimony of a man who was one of those who had actually tried this device; one who had seen it at work and who had witnessed its failure. We have the further fact that neither the patentee nor the plaintiff, so far as the evidence discloses, had ever tried out this invention. We do not think this carries any implication that the device is a useless one. We do think, however, that plaintiff is within the rule that where a fact is in dispute, and one of the parties has the means of producing evidence which would have a convincing bearing upon the

question and fails to produce it, if there is no implication that he thinks the evidence would be against him if produced, it is a reason for giving the fullest weight to the opposing proofs. The plaintiff might have given added weight to the testimony of its expert by giving him the opportunity to see the hanger in actual use. This it did not do.

[5] Lastly, we have another witness. This is the model exhibit. We think it on the whole to be a witness for the defense. This does not mean that an opinion formed from an inspection of the device would weigh against the opinion of plaintiff's expert, but it gives added weight to the testimony of the witness who subjected the device to the test of actual trial, because he testified to a failure in just those features in which, upon inspection, you would expect it to fail. We therefore feel, after some hesitation, constrained to find that the device is an inoperative one and is lacking in the element of patentability indicated.

Another branch of the defense is lack of novelty. The application does not distinguish in terms between that to which the claimed invention relates as already known to the art and that which is claimed to be new. This omission, coupled with the absence of precision of statement in what is set forth, makes it not a little difficult to be sure of the meaning intended to be expressed. If, by the expression "having an object," he meant to state in what the merit of his invention inhered, then surely he claimed novelty only in his described mode of hanger construction below, and including what he terms the "yoke." If this is merely illustrative and is descriptive of a preferred form only, then it is difficult to grasp the thought in mind, unless it was to broadly cover any hanger attached to a carrier and having a device by which articles could be taken hold of and held during transit, and which would automatically release its grip at a preselected place. Such a claim would be broader than the then state of the art would support or justify.

The claims of the patent with which we are now concerned are 9, 11, and 14. Claim 14 by itself is unintelligible. Claim 11 is evidently intended to cover a device which might be described as the one-half of the illustrated device. The claim, therefore, which has been chosen to most adequately present the case for the plaintiff is 9. Of the several elements which make up the parts of the device embraced in this claim, the crossbar with the extremities turned down, and having buttons or other forms of gripping faces on the ends, was old. The releasing arm working on a pivot and having another button or gripping face to meet and co-operate with the button on the crossbar was also old. One of the new features in plaintiff's device, as the inventor had conceived them and as we find he meant to describe them, consisted of having the pivoting pins, which held the ends of the releasing arms, separated when the hanger had two arms. He accomplished this by widening the shank below the crossbar and making of it what he describes as a "central depending plate." This was for the purpose of accomplishing the two results referred to in the special findings.

Another new feature was that the releasing arm should extend upward parallel with and close to the shank and should move toward the

shank.  This also had a purpose, as already found, and was thought to necessitate the counterbalance.  The inventor's expedient for accomplishing this was to give the arm a right-angle bend upward at the bearing point of the grip.  This was necessary for another purpose, which was also a novel feature.  This right-angle bend enabled the inventor to bring the buttons forming the grip, the part of the arm between the button and the  pivot, and the pivoting point all in alignment.  This further enabled him to get the horizontal part of the arm jambed into the space between the pivot and the end of the crossbar; the article to be suspended being held by the bite of the buttons.  This has been described as a thrust or pinch, as distinguished from the mere force of gravity.  It calls for some resiliency in the metal.  He undoubtedly thought the merit of his invention to consist in this, and the upward releasing arm parallel with and close to and with the releasing motion toward the shank.  The feature, upon which stress is laid by the plaintiff, of having grips on each side of the central pivoting plate, making of the device what is termed a twin, we find to have been known to the art.  We see in principle no distinction between two grips spaced so as to take hold at the same time of the two shoulders of a shirt, and in like manner taking hold of two handkerchiefs, or other articles.  Moreover, we doubt that the mere duplication of a known device would be a patentable combination.  The patentable merit of this invention, if it were otherwise patentable, consists in that it is a combination of the novel features mentioned with the old elements described.  Calling an old thing by a new name does not give it patentable novelty.

The applicant describes his crossbar as a U-shaped yoke.  This is not a happily chosen or accurately descriptive phrase.  If an alphabetical comparison were sought, the Greek letter "Omega" is more readily suggested by the form of this yoke.  It has certainly no resemblance to U.  The so-called yoke is nothing more than a crossbar.  We think therefore the claims of the patent should be restricted to the combination named above.

We wish to accord to the plaintiff the full benefit of the principle that, if an idea of value and novelty is present in a device, the patentee is not to lose his rights because of any mere lack of ability to express his thoughts with absolute scientific accuracy.  Few of us could stand such a test.  The combining of old things with new, however, while it should give a right to the combination found, should not prevent another inventor from using the old elements in combination with other new ideas, provided the combination is new, and in it he uses only the old elements with his own novel ones.

This brings us to the last matter of defense, which is the fact of infringement.  We find no resemblance in mechanical construction or in principle of construction or operation between the device of the defendant and that of the plaintiff, except in those elements which were known before the patent in suit was thought of.  The view of plaintiff's expert that the releasing arms of defendant's device extend upward because they are above the grip does violence to the use of language and attempts to force a construction which the words will

not bear. The defendant's grip is almost a counterpart of the Hatfield grip. If the situation of the parties were reversed, it could not be contended that the plaintiff's device infringed the defendant's, and the converse holds good. They come in contact only in those elements which are older than the plaintiff's patent. Plaintiff cannot maintain his bill unless he were able to have it established that he is the inventor of the yoke or the idea of using two known things in couples.

Defendant has given notice of an application for leave to introduce evidence of the use of a device, knowledge of which had come to defendant since the trial. This should be granted, if at all, only upon terms. Defendant has leave to make such application within five days on notice to plaintiff. If made and allowed, the case may be set down for a further hearing. Otherwise bill dismissed, with costs to defendant.

### Special Findings of Fact and Discussion Thereof.

1. The plaintiff is the owner by assignment of letters patent No. 924,722, granted June 15, 1909, for improvements in "dry-room hangers."

2. The facts involved in a finding of the features in which the respective devices of the plaintiff and defendant are common to both in form and in principle are these:

(1) Each is a "dry-room hanger," designed to aid in the same result of suspending laundried articles exposed to artificially superheated air while being carried through and around a drying room to be dried to a place of deposit and to be dropped there by the hanger automatically releasing its grip. Such hangers are old in the art, and this feature is not of itself included in the claims of the patent, nor is it involved in the case further than in the question of whether plaintiff's device is an operative one. This fact is separately found.

(2) For the purpose of being thus carried, each has at the top a means of attachment to an endless chain transporting contrivance which in principle and form are alike. The only difference is that the means of attachment provided is from opposite sides. This feature is also old in the art, and not of itself covered by the claims.

(3) Both hangers have, below the top part referred to, depending shanks, which in principle are alike and perform the same function. They differ in shape and dimensions. That of the plaintiff is relatively long and narrow and has an additional attachment feature which the device of the defendant omits. The latter consists of two relatively wide and short plates, fastened together with screws, and one plate sliding into a broad slot provided in the other. This depending shank is common to all hangers, is old in the art and not in itself made the subject of any of the claims.

(4) Each has a crossbar or transversely extending part called in the application a "yoke," having half of a gripping device at the ends. This latter feature is more fully described in a later finding. They differ somewhat in form and shape, and differ also in construction to meet the different ways in which the same function is performed. In function and in principle they are, however, alike. The points of dif-

ference, the relation of this yoke to the prior art, and the bearing of the patent claims to the yoke feature are all made the subjects of specific findings. The patentee describes, in some of his claims, this "yoke" as "U-shaped," and the whole hanger as a "U-shaped hanger." Neither the yoke shown in the drawing nor in the exhibit is so shaped, and there is nothing to indicate what the inventor had in mind, except this phrase. The defendant's yoke does not have this shape.

(5) Each has a further depending central shank below the crossbar or "yoke." These differ in form, shape, construction, relative position, and dimensions. They are alike only in the respect that each has one function common to both. This part of the hanger affords the means or base for the support of the arms hereinafter referred to and the pivoting points of their movement. The differences can be most clearly expressed in connection with another feature of the general device. The bearing of the prior state of the art, the differing functions, or, more accurately speaking, the added functions which one has over the other, and the bearing of the patent claims are separately found.

(6) Each has two arms. Each arm extends from the lower shank, to which one end is attached, and in the same direction as the "yoke." Each moves as on a pivot at the attached end, so as to permit the other end of the arm to move freely and come back to its original position. Each arm in each device has a gripping surface of the other half of the gripping device, which is made up by means of this gripping surface being brought in contact with the corresponding gripping surface at the end of the yoke; the article to be held suspended being pressed between the two surfaces. The devices are alike in that the two arms are adapted to be moved independently and either simultaneously or at different times by being brought in contact with any construction operating as a cam placed at any point in the course of the transported movement of the hanger which may be desired. The effect of contact of arm and cam is to so move one end of the arm as to separate the gripping surfaces, thus allowing the article held between them to drop in any preselected place. The two devices differ radically in the other means provided for meeting the performance of the functions which they have in common. These differences involve both mode and principles of construction and of operation, and are made the subjects of independent findings.

(7) In the plaintiff's hanger this central shank takes the form of what the patentee described as a depending plate. In position it follows that of the upper shank. It is, relatively to that of the defendant, long and wide. Length is given to it in order that the pins which form the pivoting attachment of the arms may be on a horizontal line with the bearing point of the gripping surfaces and the part of the arm between the pivot and the grip, so that all may be on the same line or all in exact alignment. Width is given to it in order that there may be a sufficient field of operation, so that there will be no interference of one arm with the other at the upper end. This lower shank or inverted post, as it is in the defendant's device, takes, in plaintiff's design, the form of just what the patentee terms it—"a depending

plate." The arm used by the plaintiff starts at the pivoting rivet and extends laterally outward in a direction parallel with the body bar of the yoke, and then is bent at right angles and extends upward to an end about one-third of its perpendicular length above the yoke. At the angle or elbow thus formed is a cylindrical or barrel-shaped knob, the outside line of whose surface supplies the bearing line of this half of the grip device. At about one-third of the upward part of the arm, a branch or other arm extends outward laterally parallel with the body bar of the yoke. This is a counter balance and has two functions. One is to bring the arm by gravity to drop back to the horizontal after the grip has been opened, and the other is to form a handle by which the operator can force the jaws of the grip down to the point where their centers will be in alignment with the lower part of the arm and jamb them together. The so-called yoke is of flat or plate metal riveted to a crossbar at the bottom of the upper shank. The form of the yoke is that, for about three-fifths of its length, it extends horizontally and along the crossbar mentioned, and for one-fifth of its length at each end is bent downward at right angles, and further bent inward in a curve, each end having one-half of a gripping device corresponding to that at the angle or elbow of the arm. The depending central plate is part of this yoke, and not an extension of the shank-post, as in defendant's device. The movement of the arms by which the grip is released is toward the shank-post, and then back again, and they are given an upright position, so as to narrow the field occupied by the hanger in its movement. This field is, however, widened by the counterbalance, so that this advantage is lost. The arms slide over the surface or face of the yoke, being held in that position by the pivoting rivets. The operation is this: The operator inserts the laundried article between the jaws. Pressure is then brought in by a pull on the counterbalance. This forces the knob on the elbow of the arm down so that the alignment spoken of is produced and the goods are held by the jamb caused by the knobs, obeying the order of the operator to get together. If a little too much force is applied to make the jamb, the elbow gripping surface is forced below the other, and the hanger then becomes inoperative. This jamb holds the article until the hanger is carried to where the cam is placed. The upward extending arm is pushed toward the shank-post. This raises the elbow; the grip opens and the goods drop. The hanger is a "twin," in the sense that the construction on either side of the center is like its brother and can operate independently. Being fastened together, they are also Siamese.

(8) In the defendant's device the crossbar or yoke has the outline shape of an ox yoke, with the ends curving downward and inward occupying the place of bows in an ox yoke. The ends are flattened out, and on this flat part there is a rectangular shaped depression, in which is placed a fairly well-fitting piece of bone with a flat surface. This is very much like what woodworkers call a "dutchman." This bone supplies a gripping surface. In the yoke is a slot extending from near the shank-post to the flat end. There are two arms which, when at rest, have the outline of extended wings. They are inserted in and

protrude through the slot aperture of the yoke and in line with the body bar part of it. From about the middle of the arm there is a finger extending downward and curving inward toward the shank-post. In this is inserted a bone button, so placed as that the middle point of its surface meets the middle point of the other gripping surface. From the middle of the yoke and extending downward in line with and in continuation of the upper post is a lower shank or inverted post. It is in no proper sense a plate, nor is the plane of its position the reverse of the upper shank, as in plaintiff's device. It is short, so that its extremity is relatively much above the bearing point of the grip. It is also provided with a slot in which the inside ends of the arms are inserted, one being placed upon the other, and a loose pin inserted through holes in the lips of the slot and the ends of the arms. This pin acts as a pivot. The device is operated by the laundried article being inserted between the jaws of the grip. These jaws are so placed that a line perpendicular to the outer gripping surface would pass above the pivoting pin. The gravity pressure exerted by the arm holds the articles in place. The jaws open and release the grip by an upward or lifted movement of the arms. The button on this finger of the arm is corrugated to add to the grip. It is made of bone to protect the goods from rust.

3. The device of the plaintiff, as illustrated in the drawing and as embodied in the exhibit, is inoperative. The metal in the latter is resilient. Two causes of its failure are that, if the elbow knob of the arm is not forced down so as to hold the goods by the bite of the jamb of the lower arm against the knob at the end of the yoke, the grip will not hold. If too much force is applied, the knob at the elbow of the arm drops to an inoperative position. We find that the device cannot be made operative through any improvement in mechanical construction, and can be made so only by dropping the novel features of the device described in the application and claims.

4. All the parts of this device above the yoke are old in the art. The construction called the "yoke" is also old, except in respect to the novel feature of a relatively wide and long depending plate having the special and novel functions which this plate was thought by the inventor to have. The width was given to prevent the releasing arms from interfering with each other above the yoke, and this was meant to be assisted by the knob of the releasing arm engaging the side of the wide plate. Length was given to it, so that the pivoting pin might be on the same horizontal plane with the gripping knobs, so as to provide the jambing action described. The releasing arms are old, except in the novel feature of having a right-angle bend at the gripping knob, so as to permit the arm to extend upward parallel with and near the upper shank, in order to reduce the width of the field of operation. The gripping device is old, except in the novel feature of the jambing action above mentioned. The automatic release is old. The adjustment of grips at each end of a body or crossbar, so that two articles may be held and released at will, is old. The only combination of elements which is novel is that of these old elements above described with the new elements above mentioned.

5. The defendant's device has no features in common with the plaintiff's device, except those which are above found to be old. The defendant's device does not employ or embody any of the features of the plaintiff's device, which are found to be novel.

The defendant has not infringed upon plaintiff's patent.