## STEDMAN v. PURITAN RUBBER CO.

(District Court, D. New Jersey. February 25, 1926.)

**I. Patents ⬡�ical328.**

1,482,952, Stedman patent, for reinforced rubber flooring and process of making, *held* invalid.

**2. Patents ⬡⟫17.**

Procurement, by skill, of better results from use of old materials and methods, does. not entitle one to patent.

**3. Patents ⬡⟫36.**

Commercial success is evidence of invention, but not where due to beauty of product, cheapness, and popular demand for product.

In Equity. Patent infringement suit by James H. Stedman against the Puritan Rubber Company. Bill dismissed.

Charles S. Jones, of New York City, for complainant.

Horace Van Everen and Alfred H. Hildreth, both of Boston, Mass., for defendant.

BODINE, District Judge. This is a suit for infringement of United States letters patent ·1,482,952, issued to James Herbert Stedman, of Braintree, Mass., for reinforced rubber flooring and the process of making the same. The specifications, so far forth as pertinent, are as follows:

"One object of the present invention is to improve the process of making rubber sheeting, of the character hereinbefore described, in such manner that the individuality of the various colors used is retained to a substantial extent in the finished article; the amalgamation and association being so controlled that the fine-grained, veined, or like appearance, so greatly desired, is successfully created and retained.

"A further object of the invention is to produce a variegated vulcanized rubber flooring, or the like, of blended rubber color stocks, which have as a component reinforcement a cotton or like fiber that has been mechanically finely comminuted and intimately associated with each color stock. When such color stocks are mixed, the reinforcement of cotton fiber in the condition described, so controls the movement of the colors during their mingling as to cause a resistance to amalgamation and thus retaining their color identities under a sufficiently prolonged period of mixing to form the fine grained or striated surface effects so much to be desired. Color stocks without fiber reinforcement blend readily into blurred masses under repeated rolling on a mixing mill, and the surface produced does not have the distinctive color effects obtained by the use of fiber reinforcement, which effectually prevents such an interflow of the colors as to obscure their individuality, thus producing a clearly marked striated design instead of a smutty blur of color streaks. * * *

"The color stock produced by practicing the process being described is now ready for the final mixing and calendering. It will be understood that numerous batches are produced in this way, each having its own distinct color, and in this art 'white' and 'black' are both classed as colors. The different colored compounds in the selection desired for the particular flooring to be made are warmed up separately, preferably being brought to almost a soft mastic state. In this condition · the various batches of compounded rubber selected, each containing refined friction, are mixed together on the warming mill preparatory to calendering. A greater quantity of one colored compound is used to form a base color for the flooring; this being selected in accordance with the design or type of flooring to be produced. This operation forms a rough blend of the colors throughout the body or base color, and they, with the cotton fiber shreds extending throughout the mass, are drawn into more or less parallel relation; i. e., a distinct grain is being developed, the formation of which is materially promoted and aided by the presence of the cotton fiber which is an integral, component part of the material.

"The sheet delivered from the warming mill is thicker than is desired, and the blending of the colors is not completed. Hence a final mill operation is required to perfect the modeling of the design and strengthen the material. This final sheeting and finishing operation is by calendering. The calendering operation continues the development of the grain by drawing the shreds, to which state the cotton fiber has been reduced, longitudinally of the sheet being formed or lengthwise the direction of feed of the sheet through the calender. The drawing of the cotton fiber into the generally parallel relation described acts to modify and control the lengthwise extension of the various colors in the sheet, the resultant effect of which is a grained or similar surface on the sheet in which each color has its own individuality and yet mingles with the others in a distinctive and novel manner. The contained fiber in the various batches used in the whole mass influences and controls the direction of movement of the individual colors in a manner to cause them to resist amalgamation and association with each other, thus obtaining a

fine color grain which stands out distinctly in contradistinction to the blurred or smutted appearance of the surface when the same compounded rubbers are used, but without the addition of friction or otherwise introducing cotton or like fiber having an equivalent function."

The claims in suit are 1, 2, 5, and 6 as follows:

"1. A variegated vulcanized rubber flooring, or the like, composed of a plurality of rubber color stocks, each of a different color, distinctively mingled with each other, said plurality of color stocks having as a component reinforcement a cotton or like fiber mechanically so finely comminuted and intimately associated with each color stock as to cause a resistance to amalgamation of the color stocks and thus retaining their individual identities under such a prolonged mixing as would cause unreinforced rubber color stocks to blend into blurred masses.

"2. The method of making a variegated rubber flooring, or the like, which comprises forming a plurality of batches of unvulcanized rubber compound, in each of which cotton or like fiber is a component part, and each of which has its own distinctive color, treating said batches separately in a manner to mechanically comminute the contained fiber and at the same time cause an intimate and uniform mixture of the fiber and the rubber, then mixing together the plurality of color batches thus prepared by rolling the batches into a sheet, the association of the fiber and rubber being so intimate and the fiber being so finely comminuted as to serve to resist interflow of the separate colors sufficiently to permit repeated rolling operations without losing color identities and thus obtain a desirable striated design, and then vulcanizing the sheet."

"5. The method of manufacturing variegated rubber sheets, consisting in making up separately a plurality of batches of stock each of which is treated in the following manner: Masticating uncured rubber and textile fiber threads into matted condition, then subjecting this matted mass together with color pigment and unvulcanized rubber compound to the action of a mixing mill, then rough-sheeting the colored mass, then passing this rough sheet through a refining mill a sufficient number of times to completely shred the fiber and reduce the mass to thin sheets; then combining the plurality of batches and mixing and rolling them into a variegated sheet, then calendering the sheet, and finally vulcanizing the calendered sheet.

"6. A vulcanized rubber flooring, or the like, characterized by a variegated surface exhibiting a plurality of mingled color stocks, of which one is of greater quantity and forms a base or background, with the remainder distributed there through in masses of relatively small bulk, the colors mingling with each other, but distinctly retaining the individual color identity of each, the whole forming a striated pattern; and further characterized by an internal reinforcement of mechanically comminuted cotton, or like fiber, so finely comminuted and so intimately associated with the colored rubber as to form a component color interflow retardative medium."

The defenses are noninfringement, noninvention, a complete anticipating in the prior art, and that Stedman was not the inventor of the patent in suit.

[1] Both the plaintiff and the defendant manufacture rubber tile, in part containing fiber stock. These rubber tiles are mottled, and present a most pleasing appearance to the eye.

In 1921, the Stedman tiles appeared upon the market. The defendant, as well as the United States Rubber Company and many others, began producing similar articles. The United States Rubber Company, after notice of the patent, discontinued the use of fiber.

Rubber tiles have many advantages as flooring, and a large business has been built up, not only by the plaintiff, but by others. The fiber, as used by the plaintiff, performs, not only the function of stiffening the tile, but of reinforcing the rubber particles.

Broadly speaking, the plaintiff takes uncured friction (parings of cotton and rubber from automobile tire stock before vulcanizing), and runs it through a cracker which kneads or combines the materials in a matted form. The cotton fiber is chewed into the rubber by the cracker. This matted material is combined with rubber and compounding ingredients, and is passed through a masticating mill, which has both a chewing and grinding effect. The batch from the mixing mill is taken to the sheeting mill, and is rolled into rough sheets; the cotton fiber being thoroughly mixed through the body of the sheet. The sheet is then passed through a refining mill, where the cotton is completely shredded and distributed through the mass. The material so produced is made in separate and distinct colors. Different colors are warmed up separately, a greater quantity of one color being used to form the base color, and a lighter color is laid on this. The sheets delivered from the warming mill are thicker

than desired, and the blending of the colors is not completed. The sheets are placed upon a calendering machine, which continues the development of the grain by drawing the shreds, to which state the cottton fiber has been reduced, lengthwise of the sheet. This calendering process is said to intensify the graining effect, and to assist in the maintenance of the individuality of each color while producing a mottled effect. The cotton is said to cause the colors to resist amalgamation. The sheet after the calendering is vulcanized and cured in the usual way. The cured sheet is cut to make floor tiles as desired.

There is no question but what the defendant follows literally the plaintiff's method.

The plaintiff's contention is that the prior art knew nothing as to the effect of cotton fiber in mottling the different color stocks, and that the patentee made the discovery that the grain in the stock produced by the action of the rolls in the warming-up mill and on the calender was aided and promoted by the cotton fiber, and that the cotton brings about a structural difference, which does not exist except where fiber stock is used. In the last analysis, the plaintiff says that his patent does produce a different body construction by reason of the presence of the fiber stock; that is, a control of the flow of color by the cotton fiber and the marked graining result in the finished tile.

The use of cotton fiber is not new in the rubber industry. It was used is the making of nose masks in order to stiffen them. It was also used in rubber soles and heels to lessen weight and increase wearing qualities. It was used in making a single color hard rubber tile such as is used in Pullman cars. It was a cheap filler, and gave a firm wear-resistant surface.

It was very old in the art to use fiber in thin sheet color stock for hot water bottles. It was old to use rags or scraps of cloth covered with rubber compound or waste in the manufacture of shoes and rubber matting and floor covering.

The British patent No. 2,541 to Forster, and the British patent No. 1,756 to Bousfield, and an early United States patent to Beck, No. 90,335, are for mottling of different color rubber stock not containing fiber. The British patent to Tayler, 1,302, of 1857, discloses a mottling with fiber stock for floor covering. It shows a mastication of the gum that is combined with fiber and refuse from flax and cotton mills. It shows a sheeting of the combined stock and a combination of colors to produce a veined or marbled pattern.

The patentee uses the usual machinery for masticating, incorporating, rolling, and cutting the material. An excerpt from page 3 of the patent (the italics are mine) is as follows:

"The several gums are to be combined by mastication, either alone or along with waste vulcanized india rubber; and the material thus obtained must be incorporated with cork, tanners' waste bark, the residue from manufacturing coconut fiber, ground refuse leather, refuse from flax and cotton mills, papier maché, and ordinary sawdust, free or freed from resin, with other suitable species of bark, pith, fiber, and wood, in a minute state of division. Occasionally may be added, as required for different articles, sulphur, pyrites, silicate of magnesia, retort residuum; also the sulphites or hyposulphite of lead or zinc (either in the state of powder or vapor); likewise natural or artificial sulphurets, kermes mineral, surphuret of antimony, alum, chalk, or lime, with other similar oxides, salts, and earths.

*"The combined gums alone, or the same combined with any of the before named matters, may be masticated with the usual coloring materials, producing masses of black, green, brown, red and other colors; which masses in various forms and quantity may be worked together and pressed into one mass, which, when cut or pressed into sheets, will afford veined or marbled patterns.*

"I employ in all my operations the usual machinery for masticating, incorporating, pressing, rolling, and cutting the material. And by means of the same, my said compositions are rolled into sheets, which may be extended to any needful size by seaming, or other means in common use, thereby rendering sheets of the material available for covering floors, roofs, walls, and like applications, and for which they may be sometimes rendered more suitable by varnishing or painting one or both sides."

It is to be noted that this patent is dated 1857. It is said, however, that the invention is not set forth in such clear terms that it can be practiced by a person reasonably skilled in the art. This point, however, does not seem to be very well taken. Tayler evidently does not particularly describe his machinery because he deemed it unnecessary. He does disclose though the process of masticating, combining, rolling, and pressing. It was so old and well known in the rubber industry that no other reference was deemed necessary. Tayler claimed his peculiar composition for floor coverings, containing a worked-up composition of rubber and cotton

fabric made into sheets, some of which he mottled. What more Stedman did, except to assert his claims in somewhat different language, has not been pointed out.

Stedman took two stocks of color, each containing fiber, and each old in this art for making fiber tiling in solid colors, and put them together on the mixing mill to mottle them in exactly the same manner that fiber and nonfiber color stocks had always been mottled. He did everything that was old, except that he says his mottled effect produced a sharper and better effect and a grain in the tile which has advantages. The same mottled effect is obtained without fiber.

There is a grain effect produced in Stedman's fiber tiling which is not present when pure material is used. It is difficult to see how this circumstance can give the patent novelty. The nonfiber tiling of the United States Rubber Company and the Puritan Rubber Manufacturing Company produce quite as sharp color effects as any tile produced by Stedman. The pure gum heels, and the other exhibits, show just as good mottling where nonfiber material is used as where fiber material is used. Stedman took nothing that was new, either by way of material or machines. He used all the old processes, and secured nothing new, except that his tile has a grain which the pure rubber tile does not have. The Stedman tile bends more readily in one direction than in the other.

The cotton used is a very small portion of the compound, and produces substantially the effect of other stiffeners. The advantages in using it are that the uncured friction demands a low price; hence the fiber tiling, which the plaintiff sells for more than the pure rubber tiling, is much cheaper to produce, and the profits much greater.

[2] The rubber tiling before Stedman's manufacture was not nearly so beautiful or so useful a material. Because he had skill in using old materials and old methods cannot give him a monopoly. This is not a case of new combination of old elements to produce a new and useful result, or effect an old result in a new and materially better way.

Stedman produced a better tile than had been known. He used old materials and old methods, and made nothing new or different from the prior art, except in quality. His contribution was manufacturing skill. Materials used in mottling must be of proper consistency. The testimony is clear that any stiffener, when properly used, will give the same effect. There is, however, no novelty in Stedman's tile, because better than the prior art knew, unless he contributed more than

better results with old materials and old methods. This he did not do.

When the plaintiff began his manufacture, rubber was very cheap. This fact made it possible to manufacture a rubber tiling which could be sold in competition with other floor coverings, such as linoleum. Prior to 1920, the rubber market had been very steady and high; hence no one thought of using rubber for the manufacture of floor coverings.

[3] Commercial success is, of course, evidence of invention, but the factors of Stedman's commercial success were not invention, but beauty of product, relative cheapness of material, and popular demand for a high grade product.

The conclusions so far given make it unnecessary to further discuss the defenses.

The bill will be dismissed.