## TOLFREE v. WETZLER et al.

District Court, D. New Jersey.    October 10, 1927.

### No. 2077.

1. Patents ⟬⟭328—1,281,690, for method of stopping leaks in automobile radiators, held invalid; "obvious;" "ingenuity."

Patent No. 1,281,690, October 15, 1918, for so-called method of stopping leaks in vessels containing water, particularly automobile radiators, *held* invalid; "obvious" meaning the quality of lying in one's way or before one's eyes, "ingenuity" meaning acuteness of understanding.

[Ed. Note.—For other definitions, see Words and Phrases, First Series, Ingenuity; First and Second Series, Obvious.]

2. Patents ⟬⟭311—Defendant's admission of infringement (imitation) of patent, validity of which is denied, forecloses issue of utility.

An admission of infringement (imitation) by defendant, denying validity of patent in suit, forecloses the issue of utility.

3. Patents ⟬⟭48—Patent may lack utility, either because its use is harmful, or because it produces a result of no advantage to public.

A patented article may be lacking of utility in either one of two senses: It may be useful, but capable only of use considered harmful; or it may be actually useless, either because it will not work, or because it will not produce a result advantageous to the public.

4. Patents ⟬⟭48—Courts may judicially notice United States patents (35 USCA § 69).

United States patents may be judicially noticed, particularly in view of 35 USCA §§ 1, 20 (Comp. St. §§ 735, 758), declaring patent was executive department of the government, and requiring particular patents to be made part of annual reports, and notwithstanding 35 USCA § 69 (Comp. St. § 9466).

5. Evidence ⟬⟭48—Courts judicially notice reports of executive departments.

It is elementary that the courts judicially notice the reports of executive departments.

6. Evidence ⟬⟭48—Courts judicially notice Patent Office records.

The doctrine of judicial notice is applicable to all of the Patent Office records.

7. Patents ⟬⟭51(1)—Test of anticipation is based on rule, that which infringes, if later, would anticipate, if earlier.

A test of anticipation is based on the rule, that which infringes, if later, would anticipate, if earlier.

8. Evidence ⟬⟭9, 51—Court may judicially notice scientific facts, and may resort to or obtain information of scientific facts from any source of knowledge deemed helpful.

The court has a right to take judicial notice of scientific facts, and as a necessary corollary may resort to and obtain information from any source of knowledge he feels would be helpful to him.

9. Patents ⟬⟭16—Patents can only be secured for application of knowledge to industry, though information may lie either in the discovery or in its application.

Patents can be secured only for the application of knowledge to industry, though the element of invention may lie either in the discovery or in its application.

10. Patents ⟬⟭17(1)—Change in proportion of constituents does not constitute invention (Patent Act 1793, § 2).

A change in the proportion of constituents is not such a difference as to constitute invention, particularly in view of Patent Act 1793, § 2 (1 Stat. 321).

11. Patents ⟬⟭21—Substitution of superior for inferior material may be judgment in selection, but not invention.

The substitution of a superior for an inferior material may be judgment in selection and adaptation of materials, and not invention.

12. Patents ⟬⟭35—Commercial success can be considered evidence of invention only when other facts leave that question in doubt.

Commercial success can be resorted to for proof of invention only when other facts leave the question of invention in doubt.

13. Patents ⟬⟭35—A large majority of users, rather than large number, must be shown before commercial success can be considered as evidence of invention.

Proof of a large majority of users, rather than a large number of users, is necessary before commercial success can be accepted as evidence of invention.

14. Patents ⟬⟭35—Commercial success, to be evidence of invention, must be spontaneous and of some duration, and not attributable to anything except need for subject-matter.

Commercial success, to be evidence of invention, requires a demand both of duration and spontaneity, and must not be attributable to anything except a need for the subject-matter.

In Equity. Patent infringement suit by Edward R. Tolfree, doing business as the "X" Laboratories, against Samuel G. Wetzler and another, doing business as the Blue Seal Chemical Company. Bill dismissed.

Fish, Richardson & Neave, of New York City (Stephen H. Philbin and Henry R. Ashton, both of New York City, of counsel), for plaintiff.

Everett & Rook, of Newark, N. J. (Russell M. Everett and Harry B. Rook, both of Newark, N. J., of counsel), for defendants.

CLARK, District Judge. [1] This is a bill in equity for the enforcement of rights arising out of a patent, No. 1,281,690, granted October 15, 1918. Plaintiff also complains of the infringement of a trade-mark ("X," No. 115,684, registered February 27, 1917), and the unfair use of a trade-name ("X Liquid"). Defendants' counsel promptly and candidly conceded that the "X" was

sufficiently a dominant feature common to both marks to amount to trade-mark infringement in goods of the same descriptive property. They further admitted that the similarity in names was likely to deceive purchasers. A decree protecting both has accordingly been entered. The use of the symbol "X" to denote quality derives its historical origin from its ancient application to dutiable goods paying 10 shillings excise.

With respect to the patent, defendants pleaded and offered proof supporting five of the eight defenses ordinarily found in patent suits. They admitted infringement. In so doing, they employed language which seems to have the sanction of accepted practice. Salt's Textile Mfg. Co. v. Tingue Mfg. Co. (D. C. Conn.) 227 F. 115. In the interests of accurate definition, imitation is suggested as a term that does not import validity. Young v. Rosenthal, 1 R. P. C. (Eng.) 29; Blakey & Co. v. Latham & Co., 43 Ch. Div. (Eng.) 23.

[2, 3] Having admitted infringement (imitation), the issue of utility seems to be foreclosed. Dubois v. Kirk, 158 U. S. 58, 64, 15 S. Ct. 729, 39 L. Ed. 895. That this should be so seems to this court an anomaly. A patented article may be lacking in utility in either one of two senses: It may be useful, but capable only of a use considered harmful to the body politic, viz. gambling (National Automatic Device Co. v. Lloyd [C. C. N. D. Ill.] 40 F. 89, 5 L. R. A. 784), or counterfeiting (Rickard v. Du Bon [C. C. A. 2d] 103 F. 868). On the other hand, it may be actually useless, either because it will not work (Ex parte Sanders, Fed. Cas. No. 12,-292), or because, even if it has the capacity to produce the result, that result is of no advantage to the public (Troy Laundry Machinery Co. v. Columbia Mfg. Co. [D. C. E. D. Pa.] 217 F. 787).

Clearly, in the first case, an imitator's (infringer's) use has no bearing on any harm to the public. Even without a knowledge of the expressed terms of the patent acts, the public very naturally assumes that the granting of a patent is some guaranty of value. The doctrine now under discussion makes it optional with the imitator (infringer) whether the judgment of the Patent Office in the matter should be reviewed in the courts. Such imitator's (infringer's) motive may be a desire to join with the patentee in mulcting a gullible public, rather than any real acquiescence in or acknowledgment of utility. It is submitted that our courts first turned the English rule of best evidence (Lucas v. Miller, 2 R. P. C. [Eng.] 155, 160; Miller & Co. v. Searle, Barker & Co., 10 R. P. C. [Eng.] 106) into the dangerous (in any branch of

the law) one of presumption (Lehnbeuter v. Holthaus, 105 U. S. 94, 26 L. Ed. 939) and now seem in a fair way to make that presumption irrebuttable (Salt's Textile Mfg. Co. v. Tingue Mfg. Co., supra). It seems unwise to require the public to depend for protection solely upon the thoroughness with which the Patent Office avails itself of its statutory right to insist upon experiment and demonstration. U. S. C. S. §§ 9434, 9435 (U. S. Code, p. 1167 [35 USCA §§ 34, 35]). The testimony as to utility in the principal case seems to come from witnesses whose sale of the product on commission naturally makes them interested in sustaining the patent. This may illustrate the point made.

Nothing was said at any stage of the proceeding as to "true and first inventor." Coming, then, to the five defenses pleaded, we have selected for extensive discussion only one—want of invention (or, as it is often broadly, and we think carelessly, called, "want of subject-matter"). In thus choosing, we are influenced, both by a desire not to incumber the reports, and by the thought that this defect in the patent is fundamental, and underlies and involves some reference to its other imperfections. We are satisfied that defendants have equally made out their case in regard to vagueness in the claims, anticipation, and public user.

It is naturally difficult for counsel to appreciate exactly what evidence appeals to the mind of a court. In the case at bar we feel that some scientific facts and part of the proceedings in the Patent Office are pertinent, and may be interesting to the Circuit Court of Appeals, if the matter is carried to them. We have therefore summoned to our assistance the principle of judicial notice. If the appellate court should conclude that we have harmfully transgressed the somewhat technical limits thereof, it is our understanding that the cause may be remanded to the trial court, with directions that it be reopened for additional proof. Firestone Tire & Rubber Co. v. Seiberling (C. C. A. 6th) 245 F. 937; Dunn Wire-Cut Lug Brick Co. v. Toronto Fire Clay Co. (C. C. A. 6th) 259 F. 258, 264; Nash Engineering Co. v. Trane Co. (D. C.) 22 F.(2d) 868.

The principal patent sets forth a process for stopping leaks in vessels containing water, by use of a composition. The claims are broad enough to include all vessels, irrespective of material, capable of containing that popular and useful compound. The specifications and the testimony of the alleged inventor, however, seem to confine them to metal vessels, and his emphasis, at least, was placed upon metal vessels; i. e., water jack-

ets, used in vehicles propelled by gasoline (internal combustion) engines.

Several experiences with patent cases give rise to the reflection that the patent bar exercises considerable ingenuity, if not in the "selection of alternatives," at least in the selection of imitators (infringers). The defendants herein do not manufacture the radiator compound concerning which the plaintiff's witnesses seemed particularly solicitous. They confine their activities, apparently, to a boiler compound and a drain pipe solvent. It may be, therefore, that they are not in as good a position to give battle upon the subject of radiators and a composition devised to cure their ills.

Leakage (an inevitable concomitant of the "obsolescence" [decay] of materials) defeats the object of the inclosure, whether that object be protection against the liquid or its preservation in captivity. Its prevention would seem to involve the successful solution of two major problems. The story of the little Dutch boy and his historic and personal stopping of the world's most famous leak is told every child. We have long, then, been familiar with the idea of placing over the leak (i. e., the spot at which the obsolescence has reached the stage of destruction) and affixing thereto some new material of the same or equally waterproof (more strictly, insoluble in, immiscible with, or impervious to water) character. Various devices for this purpose, and so, of course, various patents, both here and abroad, have been employed and secured.

In vessels—to use the somewhat Biblical-sounding word of the patent—which, or any parts of which, are inaccessible to human vision without dismantling, two other and more difficult questions present themselves for inventive answer. So we find numerous patents—again, both here and abroad—for leak detectors. (See, also, the electrical field.) Such inventions for the automatic discovery of the existence and location of the leaks, of course, necessitate a further mechanical operation, viz. the repair by human agency of the hole, after its whereabouts have been ascertained. Ex necessitate, the leak is discoverable by the liquid leaking therefrom. So a leak stopper which can be carried by the liquid solves in one operation the dismantling of the apparatus and the detection and sealing of the leak. It is the court's view that some such reasoning eventuated in the patents in the art.

The prior art patents are set forth with their ingredients (the word officially laid down in the tentative forms of the Office–Robb's Patent Essentials, p. 366) classified in accordance with their bearing on the problem as above outlined. The defendants' counsel introduced eight such patents in evidence. The court's own researches adduced one more before the date of the patent in suit and three thereafter. These patents were discovered by the court in various volumes of the "chemical abstract" in the New York Public Library. A survey of puncture-sealing compounds published by the Bureau of Standards March 14, 1927, shows 65 patents granted therefor, and indicates that a more extensive search might be further productive. The Official Gazette of the Patent Office, published annually, has no general subject-matter index, and would therefore require a volume to volume search. It is our understanding that this almost superhuman task can be avoided only by a resort to the public search room in the Patent Office in Washington and the Manual of Classification issued in connection therewith. Some sort of West System of reporting and digesting of patents, if available both to judges and to the public, might be helpful in preventing the growth of abuse we refer to later. Such systems obtain in England and some European countries.

[4] We think that at least United States patents may be judicially noticed. This despite the fact that the only decisions we have been able to find seem to doubt it. Bottle Seal Co. v. De La Vergne Bottle & Seal Co. (C. C. N. J.) 47 F. 59; Coca Cola Co. v. Whistle Co. of America (D. C.) 20 F.(2d) 261. But see American Salesbook Co. v. Carter-Crume Co. (C. C. W. D. N. Y.) 125 F. 499. We think that the learned courts in the first cases cited overlooked both that the Patent Office is an executive department of the government (Commerce—formerly, Interior—Department: U. S. C. S. § 735, as amended, U. S. Code, p. 1165 [35 USCA § 1]), and that particular patents are required by statute to be and are made a part of annual reports. U. S. C. S. § 758 (U. S. Code, p. 1166 [35 USCA § 20]).

[5] It is elementary that the courts judicially notice the reports of executive departments. Tempel v. United States, 248 U. S. 121, 39 S. Ct. 56, 63 L. Ed. 162. As a matter of fact, it seems rather strained to prevent courts judicially noticing the genuine reports of the departments in at least the other great common-law country. It has, however, been ruled against in the case of Schoerken v. Swift & Courtney and Beecher Co. (C. C. S. D. N. Y.) 7 F. 469. If it were permissible, the patents classified in England under "plastic compositions" (class 70), and in France as "arts chemiques" and "cuvis et peaux colles et gelatines" (class 14, subsection 7), would be most interesting.

The court is not unaware of the precept of pleading prescribed by section 9466 of the United States Compiled Statutes (United States Code, p. 1171 [35 USCA § 69]). Our courts seem to be stricter than those interpreting a similar English statute, and to require special notice even as to the common knowledge. Silsby v. Foote, 14 How. 218, 14 L. Ed. 394. But see Holladay v. Heppenstall, 41 Ch. Div. 109. It would not, we think, apply to evidence introduced under the theory of judicial notice.

However, we believe this evidence to be cumulative only, and any error therein not harmful. An expression of opinion on the point from the Circuit Court of Appeals would be valuable to the District Court judges. The view contended for would give them an opportunity to pursue their own investigations, and might be of material assistance in preserving the public from unwarranted monopoly.

To proceed with the analysis of the compositions of matter shown in the prior art. The court uses the above statutory phrase advisedly, although the principal and one of the prior art patents is for a process. Of that more hereafter.

The Patent in Suit.

| Patentee. | Year. | Use. | Class. | Colloid. | Solvent. | Coag. (Precip.) Agent. | Adhesive. | Waterproof Agent. |
|---|---|---|---|---|---|---|---|---|
| Stern | 1918 10/15 | Radiators; boilers | Process of stopping leaks | Gambier | Alcohol and hot water | | | |

Patents Introduced by Defendants.

| Patentee. | Year. | Use. | Class. | Colloid. | Solvent. | Coag. (Precip.) Agent. | Adhesive. | Waterproof Agent. |
|---|---|---|---|---|---|---|---|---|
| Cooper | 1908 2/25 | Boiler cleaner | Composition | Gambier | Hot water | Soda ash | | |
| Hoag | 1908 7/7 | Leak stopper in steam apparatus | Composition | Oatmeal and rice | Hot water | Litharge | | Iron filings; flake asbestos |
| La Vallee | 1910 3/29 | Leak stopper in automobile radiators; pipes | Composition | Flaxseed | Hot water | | Sugar; dextrin | Sodium borate |
| Johnson | 1911 1/10 | Leak stopper in automobile radiators; boilers | Composition | Rye meal | Hot Water; red lead | | Graphite | Powdered asbestos; iron filings |
| Olin | 1913 3/18 | Automobile radiators, and boilers | Composition | Linseed oil | Hot water | | Sugar | |
| Kather | 1913 5/13 | Leak stopper in pneumatic tires | Composition | Flour | Alcohol and water | Alum | Sugar; glue | Rubber flakes |
| Causey | 1913 5/20 | Leak stopper in pneumatic tires | Composition | Magnesium | Wood alcohol and water | Glycerin | Dextrin | Asbestos |
| Seely | 1914 11/17 | Leak stopper in pneumatic tires | Process of making composition | Gambier | Claret | Quebracho | Glucose | Asbestos |

Patents Discovered by the Court.

Before the Patent in Suit.

| Patentee. | Year. | Use. | Class. | Colloid. | Solvent. | Coag. (Precip.) Agent. | Adhesive. | Waterproof Agent. |
|---|---|---|---|---|---|---|---|---|
| Thompson | 1913 8/19 | Stopping leaks | Composition | Linseed and flour | Hot water | Camphor | Lamp black | Wood ash |

After the Patent in Suit.

| Patentee. | Year. | Use. | Class. | Colloid. | Solvent. | Coag. (Precip.) Agent. | Adhesive. | Waterproof Agent. |
|---|---|---|---|---|---|---|---|---|
| Key | 1921 9/27 | Sealing paste | Composition | Graphite | None | Soda bisulphate | Molasses | Baking |
| Shrum | 1921 7/5 | Leak stopper in radiators, pipes, boilers | Composition | Wheat or rice paste | Wood alcohol | Salicilic acid | Gum arabic | Asbestos |
| Dolan | 1922 4/18 | Leak stopper and rust remover for radiators | Composition | Cutch | Water | Soda ash; tannic acid | Graphite | Red oak bark; Irish moss |

The above classification is based on information which the court—as the financial bar is accustomed to say—believes to be reliable. Thus the assignment of substances as colloids comes from the books on colloidal chemistry consulted by the court; solvents, from the tables in the Chemist's Handbook, obtained by the court in the New York Public Library; coagulating agents, from Gardner's Chemical Symbols and Trade-Names, and from various volumes of the Chemical Abstract similarly obtained; adhesives, from the same source; and the waterproofing materials, in Ross on Waterproofing Construction Engineering.

All the patents are for compositions of matter, except Seely and the one in suit. The former is for a process of making a composition. Four are for stopping leaks in metal vessels, containing water (and in the La Vallee, the Johnson, and the Olin patents the said vessels are the cooling system of automobile [internal combustion] engines), and three for stopping leaks (therein called punctures) in rubber vessels (tires) containing air (nitrogen and oxygen), instead of water (hydrogen and oxygen).

In the court's view, this comparative statement of the prior patents requires no very elaborate supplemental examination of principles and statement of authority to convince of the invalidity of the patent in suit. However, the well-deserved reputation of counsel for the plaintiff and the actions of the Patent Office make some further discussion necessary.

The court was not as surprised as some of the late Judge Hough's other auditors (at the annual dinner of the New York Patent Law Association) at that most able and greatly lamented jurist's statement that, at the present annual rate, 150 patents were granted on each of the 200 working days in a year.

The court is not setting out in detail the proceedings of the Patent Office in this cause by way of criticism, or in the hope of effecting any reform, if one is needed. Its present lack of familiarity with the problems confronting that office would make any such purpose presumptuous. Furthermore, it seems not unlikely that its work is the most effective that can be accomplished under present conditions. We understand that, although the Patent Office annually turns over a surplus, nevertheless it is undermanned and underpaid. It would seem, however, that utilization of this surplus to increase staff and salaries would be a wise step in the public interest.

[6] The proceedings in the Patent Office, however, are most pertinent in weakening the presumption of patentable novelty that attends the granting of a patent. Westinghouse Electric & Mfg. Co. v. Toledo, P. C. & L. Ry. Co. (C. C. A. 6th) 172 F. 371; Gamewell Fire Alarm Tel. Co. v. Hackensack Improvement Commission (D. C. N. J.) 199 F. 182. The fact that an application was made prior to the one which ripened into the principal patent appeared from the face of that patent. Upon the court's inquiry from the Commissioner of Patents, it appeared that this application had been rejected by that office. The Commissioner forwarded certified copies of the proceedings leading up to this rejection and they are made a part of the state of the case. The doctrine of judicial notice is certainly applicable to all of the Patent Office records.

They show that on August 10, 1917, Stern, the present patentee, made application for a patent for a composition to stop leaks in radiators. This application can be summarized from its specifications and claims thus: "Gambier, or a substance containing tannin, and liquid solvent (alcohol mentioned in one claim) heated and added to water to form a colloidal solution or suspension." This application was rejected on August 30, 1917, by Examiner A, acting examiner in division 6 (the Chemical Division), on reference to the Seely patent. See table on page 217 of this reporter. The applicant's patent solicitor was notified as required by statute. U. S. C. S. § 9448 (U. S. Code, p. 1169 [35 USCA § 51]).

On August 30, 1916, his solicitor submitted an amendment. This, in so far as it was substantial, expatiated on the merits of alcohol as a solvent, largely on the theory that a vaporization point lower than that of water would drive the suspended particles in some manner against the walls of the radiator. How this would come about chemically was not explained, then or since, and, as we shall see, is contrary to accepted principles. On September 21, 1918, the amended application was again rejected on the same reference (i. e., Seely patent) by Examiner B, Chief of the Chemical Division.

The solicitor, to drop into the vernacular, seems to have been "a glutton for punishment," because, on September 22, 1919, he again amended his application, and accompanied this amendment with an elaborate argument in which he attempted to distinguish the Seely patent. As this same argument has already appeared (and, doubtless, will again appear) in the mouth of the trial counsel, it will be dealt with later in this opinion. This amendment could not be entered because

of the express terms of the statute (U. S. C. S. § 9438; U. S. Code, p. 1167 [35 USCA § 37]) providing for the abandonment of patents for failure to prosecute within the year. Of this the solicitor was notified on October 1, 1919.

It could not, however, have been a very grievous blow to him, because now comes the most curious, in our opinion, part of the proceedings. It appears from the Patent Office file wrapper (formally offered in evidence) that on December 18, 1917 (note the overlapping of dates all through the two proceedings), an application was made for a process patent. That patent was practically in hæc verba of the previous application for a composition of matter, except for the slight changes in phraseology necessary to describe it as a method. Inasmuch as the examiners attached no importance—correctly, as we think—to this change in form, we shall postpone our discussion of its significance, or lack of it, until later on in this opinion.

This application was rejected January 9, 1918, on reference to the Hoag and Johnson patents (see table of prior art patents on page 217 of this opinion), with this accompanying statement by Examiner B (the same examiner who considered Stern's amended composition application): "These references show that it is old to put *colloidal mixtures* in steam and water circulating systems, such as the radiators of automobiles, for the purpose of stopping leaks." (Italics mine.)

There was no mention of the application of five months previous and its rejection, or of the Seely patent, upon which that rejection was based. On February 26, 1918, the patent solicitor furnished applicant Stern with a letter of introduction to the above examiner and a request for an interview. These interviews seem to be provided for in the rules of the Patent Office. Rule 13, p. 3. Whether they are normally preceded by letters of introduction is not known to the writer. The rules seem to be silent on the point.

At the interview—of which there seems to be no stenographic transcript; again the rules are silent—Stern submitted immaterial amendments and an earnest argument to the effect that iron filings (contained in the compositions of the references) are not colloids, and that gravity consequently prevents their free circulation. As a matter of chemistry, the soundness of this argument may be doubted. There was no further allusion to the superiority of alcohol over water as a solvent. This interview seems to have taken place on March 4, 1918, and on March 13th—mirabile dictu—the patent was granted.

So, in summation, it appears that, after the rejection of a composition application upon reference to a certain prior patent, a process patent for the exact same composition of matter was thereafter granted, without any mention of the patent instrumental in bringing about the previous rejection. This, although there is practically no pretense but that both applications dealt with the same subject-matter in the same way. It further appears that the patents to Olin, Seely, La Vallee, Cooper, Kather, and Causey were not considered by the Patent Office examiners on either of the applications for the patent in suit. The effect of such a perfunctory examination, instead of a critical analysis upon the presumption arising out of the grant is dealt with in the case of Imperial Bottle Cap & Machine Co. v. Crown Cork & Seal Co. (C. C. A. 4th) 139 F. 312.

Although, as we have said, eschewing criticism, we cannot pass on without saying a word on the wider question of public policy indicated. In all other fields of the law the presumption is against monopoly and in favor of competition. The court suggests that the Patent Office should not allow its legitimate desire to foster genius to cause it to forget its duty to the consuming public. A very equitable procedure for appeal from the Commissioner's decision is provided for by statute. U. S. C. S. §§ 9456, 9458 (U. S. Code, p. 1170 [35 USCA §§ 59, 61]) as amended by 44 Stat. at Large, p. 1335. A more careful scrutiny of their applications and their art, and the more frequent compulsion of the applicants to resort to the statute, would seem to be a decided improvement upon the present wholesale grants.

The Patent Office was created as a guardian equally of the public's interest in competition and the inventor's right to the fruits of his brain's discovery. It abandons this first function if it permits the public to depend upon the commercial interests of an imitator impelling litigation for its protection. Our own Justice Bradley, universally acknowledged to be one of the country's greatest patent judges, said in his forthright manner, speaking for the court, in Atlantic Works v. Brady, 107 U. S. 192, 200, 2 S. Ct. 225, 231 (27 L. Ed. 438):

"It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch

the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith."

That the English judges also observed the same tendency would appear from the remarks of Lord Justice Lindley, in Blakey v. Latham, supra: "Unless the line is drawn closely, we shall have trade paralyzed in every direction and no end of actions. One knows perfectly well that now one may get a patent for anything almost."

It is interesting to note that, in the debates accompanying the passage of the Patent Act of 1793 (the second Patent Act), Congressman Murray (Md.) suggested "investing the judges of the District Court with the power of granting patents in the several states, for the greater accommodation of the citizens and more extensive encouragement of genius." Annals of Congress, 1793, p. 854. It is safe to predict that, if such a procedure were followed, there would be a remarkable falling off in the number of patents granted.

Judge Hough, in the address above adverted to, places the blame for this situation partially at least on the patent bar. Even his unofficial utterances seemed to us entitled to such weight that we quote a brief extract from them:

"For, if considered in the large, the results must be small; otherwise, there could not possibly exist 45,000 units per annum. They are small because the office under your pressure seems to me to require utility in the degree expressed by chemists as 'a trace,' novelty to the extent of a new coat of verbal paint, and invention in that no 'reference' can be found against the thing proposed—reference meaning something discoverable in the indices of the office.

"Is it not the pressure of a singularly well organized professional clan that has produced this mechanical multiplication of the commonplace! You know so much more than the men who appraise what you say your clients have devised; it is so much easier for the examiners to pass the little ordinary thing that has no history and will have no future, than to oppose the profession. Can one wonder at the Office? I do not; but what I wonder at is that no one seems to perceive that outside the circle of patent makers is a public upon whose estimation of patents

the repute and even the maintenance of the system ultimately depends."

Even to one only recently cognizant thereof, such members of the patent bar as appear in the courts are a model to lawyers generally in their courteous treatment of the court and each other, and their unusually nontechnical manner of trying cases. We hesitate to think that any members of their calling fall below this high standard. If they do, it would seem to be part of wisdom for the patent bar generally to bring about a reform from within. We gather that this is their own view from the 1925 address of the chairman of their section of the American Bar Association, wherein he says:

"I long shared that opinion; but now I have reached the view that the growing evils which have become excrescences upon our patent system must be abated or the system itself will be in danger. *It is better that it be amended at the instance of its friends than left to the tender mercies of its enemies.* The present seems a favorable time to consider reforms, since now there appears no such enmity to the patent laws as was evidenced many years ago."

We have adverted to the proceedings in the principal patent. A comparison inter se of the prior art patents raises considerable doubt as to their validity one to the other. Moreover, the Patent Office seems to be still at it. Since the date of the granting of the patent in suit, the court finds three more patents with leak-stopping compositions containing substantially the same ingredients. See schedule, page 217. We have included them in our schedule simply to illustrate our remarks in respect to the Patent Office. Their references to certain well-known features of the art may have some inference or bearing on the state of the common knowledge.

We have said that we shall consider the validity of the patent in detail only from the point of view of invention. As must, we think, appear from the development of that discussion, it manifestly lacks also the equally fundamental novelty. This lack is apparent, whether it be sought in anticipation by prior specification (sometimes called 'paper anticipation'), by prior general publication, or by prior public use. It might be observed that the cases seem often unaware that these defenses are simply three different states of fact negativing the one issue, namely, novelty. Croysdale v. Fisher, 1 R. P. C. (Eng.) 19. Furthermore, it is not always realized that specifications may be used for two purposes, either to prove anticipation, or to add to the common knowledge at the date of the

patent. Thompson v. McDonald Co., 8 R. P. C. (Eng.) 9.

We have chosen to emphasize want of invention for two reasons. What seems to us to be the present liberal attitude toward the granting and validity of patents may well be the outcome of and the reaction against a too great insistence in the past upon the prior patents. Both in England and in this country distinguished patent judges have taken .occasion to express their unfavorable official opinion of this practice. Judge Amidon, in Naylor v. Alsop Process Co. (C. C. A. 8th) 168 F. 911, refers to "the limboes of parchment casuistry," and similarly, in Pirrie v. York Street Flax & Spinning Co., 1 L. R. Ireland Ch. Div. 417 (1893–1894), we find Lord Chief Justice O'Brien speaking as follows:

"It was disinterred in the Patent Office after an apparently protracted delving, and affidavits in reference to it 'thick as leaves in Vallambrosa' were showered upon us. I have no sympathy at all with the contention founded upon this exhumed document. * * * It now seems to be a profession to dig up still-born patents in order to rob living inventors of the fruits of their industry."

It is because of these extreme cases, it is submitted, that examiners and judges overlook the real danger which lies in the present availability of the Patent Office's records. In both the public and the law libraries of all our large cities are to be found the volumes of the Official Gazette of the Patent Office summarizing the patents granted. In some of the public libraries one may find digests containing the patents of foreign countries. So, in New York, the court found a complete set of English and Canadian patents, the German patents from 1881 ("auszuge aus dem patent schrifte"), and the French from 1892 ("brevet de invention"). It seems not unlikely that even a superficial study of these works would result in further applications. In fact, the actions of many of my fellow students, observed during my hours in the New York Public Library in the preparation of this opinion, pointed to just such a purpose on their part.

[7] In the second place, the defense of anticipation involves the always somewhat unsatisfactory task of construing documents, and further, perhaps, of determining how far the various prior patents can be considered collectively. Here, again, the courts have expressed disapproval of the mosaic doctrine. Mosely v. Victoria Rubber Co., 4 R. P. C. (Eng.) 253. One of the great platitudes of the patent law is, of course, the test of anticipation, namely: That which infringes, if later, would anticipate, if earlier. Knapp v. Morss, 150 U. S. 221, 228, 14 S. Ct. 81, 37 L. Ed. 1059; Lister v. Norton Bros., 3 R. P. C. (Eng.) 205. The difficulty of applying this test to the four corners of always technically and often obscurely worded documents is manifest. It compares unfavorably with the simplicity, in one aspect, at any rate, which may be based upon the ascertainment of the general public's knowledge of a given subject.

In another aspect, however, even here the judge is confronted with an overwhelming task. We heartily concur with the apologia of Mr. Justice Pierson, in Musgraves v. Hicks & Hargreaves, 3 R. P. C. (Eng.) 51: "I confess that I approach the decision of the case with considerable diffidence because I have had to deal with branches of science with the very rudiments of which I am sorry to say my education has not made me acquainted."

In England the Legislature has hearkened to the distressful judicial cry and has provided by statute for their relief. So, in section 98 of the Judiciary Act of 1925, it is provided: "In any cause or matter before the High Court or the Court of Appeal, other than a criminal proceeding by the crown, the court may, if it thinks it expedient so to do, call in the aid of one or more assessors specially qualified and try and hear the cause or matter wholly or partially with their assistance." See, also, section 31 (1) Patents and Designs Act, 1907, 7 Edward VII, c. 29, and Rules of the Supreme Court, 1883, Orders 36, 43; also, Marconi v. Helby Wireless Tel. Co., 31 R. P. C. (Eng.) 121.

In this country, as far back as the time of the passage of the first Patent Act in 1790, the same difficulty seems to have been realized, because we find mention of a plan for three referees, instead of juries, in patent cases. In the debates thereon it is stated that "there will be a much greater probability of justice done by having arbitrators who are men of science." Annuls of 1st Congress, p. 1416. The plan, however, seems to have died in its inception.

In 1878, however, perhaps because of our propensity for extremes, bills for the segregation of patent litigation in a patent court began to appear. 7 Cong. Rec. 1457, 1627. Nothing came of these proposals. They received, however, fresh impetus by a threatened diversity of decision following upon the act of 1891 governing the Circuit Courts of Appeals. Mast, Foos & Co. v. Dempster Co. (C. C. A. 8th) 82 F. 327; Stover Mfg. Co. v. Mast, Foos & Co. (C. C. A. 7th) 89 F. 333; Mast, Foos & Co. v. Stover, 177 U. S.

485, 20 S. Ct. 708, 44 L. Ed. 856. So in 1898 bills for the creation of a patent court again appeared. 31 Cong. Rec. 848, 31 Cong. Rec. 3277, 33 Cong. Rec. 539, 686. The American Bar Association also interested itself. 23 Am. Bar Ass'n Rep. 543. And see, also, "The Proposed Court of Patent Appeals," 6 Mich. Law Rev. 441; "A New Federal Court," 20 Green Bag 203; and 18 Harv. Law Rev. 217. We have not space here to cite and discuss the various bills introduced from that time on. The agitation seems to have been brought to an end by a disagreement within the ranks of the patent bar itself (43 Am. Bar Ass'n Rep. 57, 44 Am. Bar Ass'n Rep. 38), and in a final report in 1920 of a committee of the section of patent, trade-mark, and copyright law the project for a special court was disapproved. 45 Am. Bar Ass'n Rep. 398. See, however, "Need of a Special Patent Court—The Engineer's Point of View," 93 Cent. Law J. 96. And see, also, Professor Frankfurter's thorough and interesting exposition of the work of the federal courts in his book, "The Business of the Supreme Court."

It is no reflection upon the learned gentlemen—both leaders in the chemical research field—who testified in this cause to say that their services cannot be compared with those of an impartial assessor. Their viewpoint is and can legitimately be biased. Further, and more important, the court, without an assessor, is not sufficiently informed scientifically to be able to guide their examination towards the most effective arrival at the truth. So strongly does the writer of this opinion feel, even after his brief experience, that he is resolved to take at least courses in chemistry and in electrical and mechanical engineering. He hopes thereby to make his actual conduct of patent hearings intelligent, in the sense that he will not lose the benefit of meeting the experts upon at least partially common ground.

Both the limitations of space and of natural ability forbid any extended exposition of the well-settled principles by which invention is to be judged. The early English cases indicate development of the patent law prior to and quite apart from any statute. See Darcy v. Allin (1602) Noy, 173, 182, 11 Coke. 846; In re Clothworkers of Ipswich (1615) Godbolt, 252. The probable course of that development, if it had been permitted to continue, affords an interesting field of speculation. Protection of property in products of the mind does not ex necessitate require the legislative interference of the state. Abuse of or injury to that property might be prevented by the exercise of the ancient and most fundamental part of equity jurisdiction, namely, the prevention of fraud.

We see a cognate application of such exercise in the cases of unfair trade. It may be that Parliament's failure to leave the matter to the courts was (in so far as it was not influenced by the historical disputes between the crown, on the one hand, and the guilds, on the other), because of the practical difficulties involved. It is hard to distinguish duplication which is in fact the result of copying another's product from duplication which is in fact the product of independent mental effort. For that reason, it is easier to make up for the general failure to protect by granting a limited and exclusive monopoly, which will compensate for future imitation. It is clear that there is less likelihood of imitation in fact in products which can be created by ordinary skill. It is submitted, therefore, that the same result could have been accomplished by leaving to the courts to use as a presumption the necessary distinction between "obviousness" and "ingenuity," imported by the words of the Patent Act; the same result, that is, with the important exception that the public would enjoy the benefits of competition, even among geniuses. However that may be, the factual problem presented to the courts is in the last analysis the same.

We agree that "it is difficult to express in words with preciseness what is meant by ingenuity and what is meant by invention." Dunbar v. Meyers, 94 U. S. 187, 24 L. Ed. 34; Williams v. Nye, 7 R. P. C. (Eng.) 67. It has been referred to by our Supreme Court as "an impalpable something" (McClain v. Ortmayer, 141 U. S. 419, 12 S. Ct. 76, 35 L. Ed. 800), and by Judge Hough, this time speaking officially, in Marconi Wireless Tel. Co. of America v. De Forest Radio T. & T. Co. (C. C. A. 2d) 243 F. 560: "The point is not capable of much argument, the appeal is to a kind of conscience, and the court or jury intuitively and conscientiously feel either that invention is absent, or that something akin to genius is displayed in the visible, tangible result of the mental concept."

Two limiting factors which should serve as guides are too often, we think, lost sight of by the courts. They are, first, that the grant of a patent is a reward; and, second, that the reward is for a result and not to a man. That being so, the distinction between the obvious and the ingenious was the proper line of demarcation. It is so laid down in innumerable causes both here and in England. Pearce v. Mulford, 102 U. S. 112; Mathey's Case, 1 W. P. C. (Eng.) 6; British Oxygen Co. v. Maine Company, 41 R. P. C. (Eng.)

185. Any more detailed definition is, of course, a question of philology. For that reason, the court is quoting those given in the Centennial Edition of the work of that greatest of all authorities on English words—George Crabb, A. M.:

## Obvious.

"Obvious, in Latin, obvius, compounded of 'ob' and 'via,' signifies the quality of lying in one's way or before one's eyes. * * *

"What is obvious presents itself readily to the mind of every one; it is seen at the first glance, and is opposed to that which is abstruse. * * *

"These words agree in expressing various degrees in the capability of seeing; but visible is the only one used purely in a physical sense; apparent, clear, plain, and obvious are used physically and morally. * * *

## Ingenuity.

"Ingenuity: Wit, from the Anglo-Saxon witt, knowledge; German wissen, to know, signifies knowledge or understanding.

"Both these terms imply acuteness of understanding, and differ mostly in its mode of displaying itself. Ingenuity comprehends invention; wit is the fruit of the imagination, which forms new and sudden conceptions of things. One is ingenious in matters either of art or science; one is witty only in matters of sentiment. * * *"

An English author has said that the decisions are really decisions of feeling, as the judge is ruling from the background of his own experience and life. That being so, the necessity for enlarging that experience by scientific study on the part of the judiciary heretofore suggested is made more apparent. The standard set up is an external one, since the community is interested in achievement. The test is what is obvious to a person skilled in the art and acquainted with the common knowledge in that art at the date of the patent. Hendy v. Golden State Iron Works, 127 U. S. 370, 8 S. Ct. 1275, 32 L. Ed. 207; Landesmann v. Jonassen (C. C. S. D. N. Y.) 32 F. 590, appeal dismissed 140 U. S. 686, 11 S. Ct. 1023, 35 L. Ed. 601; Lyon v. Goddard, 10 R. P. C. (Eng.) 334. So, also, we are not considering the personal merits of the inventor. He may obtain his object by a happy flash of inspiration or without any prolonged experiment or thought. Longbottom v. Show, 6 R. P. C. (Eng.) 143, 8 R. P. C. (Eng.) 335. He may not even know the scientific theories underlying his invention. Eames v. Andrews, 122 U. S. 40, 7 S. Ct. 1023, 30 L. Ed. 1064; Hogan v. West-

moreland Specialty Co. (C. C. E. D. Penn.) 163 F. 289.

Let us apply these tests to the patent in suit. What does the patentee claim are the "steps forward" which he has taken? If we understand him correctly, they are (1) a process, instead of a composition; (2) the application of the chemical term 'colloidal solution' to his composition; (3) the use of the ingredients (materials), gambier and alcohol, instead of the ingredients of the various prior patents; (4) the use of gambier or alcohol in a boiler or automobile radiator instead of in a bicycle tire; and (5) the commercial success of his product. Do any of these steps escape the obvious and qualify as ingenious? We think not.

The first two contentions, if sound, would indeed be attaching importance to labels. A "rose by another name" might then be patentable. The argument based on the process patent was mentioned at the hearing. We do not find it in the brief, and therefore assume it has been abandoned, as well it might be. According to the Commissioner of Patents, it seems to have contributed, however, to influencing the grant. We suggest, therefore, either a different system of indexing in the Patent Office, or else a return to the more simple classification of subject-matter found in the statute of James.

The phrase "composition of matter" was not contained in the original Patent Act of 1790 (1 Stat. at Large, 109), and first appeared in the Act of 1793 (1 Stat. at Large, 318). A diligent search of the debates of Congress does not reveal any reason for its addition to section 1 of the statute. It seems to have been taken from the expression in the opinions of various English judges. Curtis on Patents.

Clearly any composition patent can be turned into a process patent by the simple expedient of calling its use or application to industry a method. Equally, of course, such a procedure imports no invention not already found in the composition. Cochrane v. Deener, 94 U. S. 780, 24 L. Ed. 139; Expanded Metal Co. v. Bradford, 214 U. S. 366, 384, 29 S. Ct. 652, 53 L. Ed. 1034. In the principal case, the process is nothing more than a claim that the composition of gambier and alcohol can be used to stop leaks in radiators, boilers, etc., and so it escapes the above objection only in this, that it is circulated in the cooling system. Is that novel? No. In the nature of things, this style of leak stopper must be placed in the liquid whose leakage it is desired to stop. No new apparatus for the circulation of that liquid is even claimed. In four patents

of the prior art, involving automobile engines, the same method of circulation is employed. In the Kant-Rust Case (Polygon Products Corp. v. Kant-Rust Products Corp. [C. C. A. 3d] 292 F. 569), it is to be noted that one of the novel features claimed involved a penetrant which was useful in causing the rust-dissolving acid to reach—i. e., circulate—to places otherwise difficult of access. This was held by the court to be an ingenious method of circulation.

We have spoken before of the argument made in the Patent Office by the alleged inventor about the vaporizing point of alcohol. Although he does not say so, then or now, this is really an argument for a method (process) of circulation. There is no chemical testimony on the point. This omission may be due to the fact that any such testimony would be exactly to the contrary. Young's Distillation Principles and Processes, Boiling Point of Mixed Liquids, p. 49. Furthermore, of course, two of the other patents contain alcohol and one claret as ingredients.

[8] The patentee's next argument in favor of validity is based on the science of chemistry. It becomes necessary, therefore, to outline the common knowledge in the particular branch of that science with which our art is concerned. It is well settled that the court has a right to take judicial notice of scientific facts. Illinois Cudahy Packing Co. v. Kansas City Soap Co. (D. C. Kan.) 247 F. 556. As a necessary corollary, of course, he may resort to or obtain information from any source of knowledge he feels would be helpful to him. 23 Corpus Juris, 168. The court has therefore made such investigation of colloidal chemistry as lay within its feeble capabilities. In stating the results thereof, it wishes to express its reluctance at what may have the appearance of a parade of learning, a reluctance, alas, heightened because in this parade the whole chemical profession—even such part of it as is still in high school—in the sense of the song current during the War, may be "out of step with it." However, with all our imperfections on our head, we are thoroughly satisfied that the patentee's touchstone of validity, viz. a colloidal solution, has been obvious to those skilled in the chemical art for many years. It would seem to be pedantic in this brief discussion to cite the books examined by pages. We therefore rest content with stating that they were: Jones, The Nature of Solutions; Whetham's Theory of Solution; Freundlich, Colloid and Capillary Chemistry, Elements of Colloidal Chemistry, and New Conceptions in Colloidal Chemistry; Bogue, Colloidal Behaviors; Bancroft, Applied Colloidal Chemistry; Alexander, Colloidal Chemistry; Von Weimarn, History of Colloid Chemistry.

Judge Buffington, in his interesting opinion in the Kant-Rust Case, supra, discusses the origin of colloidal chemistry, and shows that an Englishman by the name of Graham (1861), director of the mint, was the pioneer in the field. Even before his day, Selmi (1844) the (sulphur sol) an Italian chemist, had realized that all substances could not be placed in pure solution. There is evidence, also, that the mineral sols prepared by reduction of salts were known to and were part of the scientific equipment of the ancient alchemists.

It is known that a dissolved substance passes over from the more concentrated to the more diluted solution, and continues to do so until equality of concentration is established. This phenomenon has received the name of diffusion. Fick proved that it obeys Fourere's law for the dissemination of heat and Ohm's for the conductivity of electricity. It is apparent that any force which causes, for instance, a heavy solution to rise against the pull of gravity in a very much lighter liquid must be a powerful one. Chemists seem to be of the opinion that this force is either osmotic pressure, or else that diffusion and osmotic pressure are caused by some common force as yet undiscovered. This, because the two phenomena seemed to be subject to similar laws; i. e., Boyle's law, the principles of Sorret, the law of temperature coefficients, etc.

Graham, by the use of vegetable parchment (dialysis), showed that certain amorphous and generally organic, as distinguished from inorganic, substances diffused either very slowly or else not at all. These he named "colloids" (Greek, "collos"—"glue"), as distinguished from crystalloids. Such a distinction, of course, implies different kinds of substances.

Subsequent to Graham, but for many years prior to the patent, physical chemists have inclined to the view that crystalloids and colloids are not different kinds of matter, but rather different states of matter, and that the same chemical substance may be obtained in one state as well as the other by suitable alterations of the conditions under which it is produced. For instance, Paterno's researches indicate that tannin (the very substance in the present patent) may form a sol in one liquid, water, and a true solution in another liquid, acetic acid. The German chemist, Von Weimarn, has already succeeded in obtaining more than 400 substances in the colloidal state. As a matter of fact, Pro-

fessor Pond, the plaintiff's expert, upon questioning by the court, seemed to agree that such was the case. So, Professor Alexander, in a paper ("The Colloid State as a Universal Property of Matter") written in 1906, says: "Any solid substance, regardless of what its chemical nature or any of its other properties may be, must always pass in dissolving through a colloidal state of solution."

The fundamental idea underlying the chemistry of colloids is that of heterogeneity (as contracted with the apparent [?] homogeneity of true solutions). This heterogeneity exists between certain well-defined limits. The upper limit has been established. It lies above the limit of microscopic visibility (10-5cm.). At this dispersity, the properties of the substance begin to differ appreciably from the properties of the substance as it ordinarily occurs. The lower limit cannot be below the dimensions of molecules (10-8 cm.). Depending upon the degree of dispersity, we have emulsions and suspensions, emulsoids and suspensoids (the dispersion medium being a liquid, the emulsion arises when the dispersed phase is a liquid, and the suspension, when it is a solid). No attempt is made by the patentee to indicate which of these classes he intends. Besides dialysis, mentioned above, there are innumerable methods of determining when chemical substances are in a colloidal state. Testing by means of the ultramicroscope (Zsigmondy) and by the Tyndall effect are two of the best known.

The chemists have written volumes on the various properties of colloids (electrical, optical, etc.). We think we need only consider two of these properties. In 1827, Brown, an English botanist, observed that pollen grains, when suspended in water, are not at rest, but in constant motion. They oscillate around a mean position without apparent diminution for an indefinite period. Several explanations of the Brownian movement have been given. The one which seems to have been accepted—that it is due to the impacts of the liquid molecules in the particles; i. e., that the kinetic energy of the molecules of liquid is the source of the kinetic energy of the particles—was first advanced by Ramsay in 1892 and again exploited by Einstein in 1907. It is only important for our purpose that the result of the movement is to overcome the force of gravity. Thus the particles remain in suspension in the suspension medium —in the patented composition, alcohol and water.

We have said that we were possibly concerned with another property. We use "possibly" advisedly, because the court is unable to determine from the testimony exactly what is the plaintiff's theory as to the hardening (gelation) of the particles in or upon the openings in the radiators or boilers. Graham discovered, and it is a fact, that colloids are extraordinarily sensitive to chemical reagents. It follows that the addition of a small quantity of such an agent (electrolyte) brings about the formation of a precipitate (sometimes termed 'pectization' or 'coagulation'). This seems to have been the reason for the substances found and tested under that head in the prior art patents. Although the plaintiff's expert seemed to rely on the principle, it is noticeable that the patent in suit contained no such ingredient. On the other hand, it may be that it should be attributed to cooling (evaporation), apparently one of the crystallization methods of preparing colloids. It may even be that it is a problem in thermodynamics, or, more simply, the application of heat, known since the beginning—in the Dark Ages—to the art of pottery.

As there are many properties of colloids, so also are there many methods of preparing them. We have just mentioned one. They have been conveniently classified as crystallization methods, solution methods, and electrical dispersion methods. Here, again, we need not particularize. One of the earliest methods is known as the "replacement of solvent method," of which the preparation of a gamboge (gum arabic) sol is the classic example.

[9] Patents can only be secured for the application of knowledge to industry. The element of invention, however, may either lie in the discovery or in its application. We think it must be abundantly clear from this recital that the common chemical knowledge of a period long prior to the date of the patent was not only equal to, but in advance of, that displayed by that document. Let us, then, examine its application in this case.

The books show an extensive use in industry of the principles we have just endeavored to outline. So we find that colloid chemistry plays an important part in tanning, ceramics, dyeing, brewing, photography, fertilizing, electroplating, cement mortar and plaster making, various methods of manufacturing steel, chrome steel and nickel steel, soap making, ice cream and confectionery making, rubber making (coagulating), preparation of alloys, and—last, but not least, perhaps— formulas in integral and fabric waterproofing and in boiler compounds. We find, for instance, one of the text-writers speaking of the last thus:

"Most boiler compounds contain such soluble colloids as dextrin, tannin, and bark extract, and some engineers put potatoes or starch in their boilers, together with soda ash."

One cannot fail to notice the significant similarity of the ingredients mentioned in the above quotation with those in the prior art and the principal patents. We are not going to take the time to exhaustively analyze these different uses in the different arts. Some, at least, of these purposes seem to us clearly analogous (cognate) to the purposes of the principal patent. But whether they are or not seems, in the light of the individual applications, shown by the patents in the prior art, a matter of supererogation.

Seven patents show the use of various substances in a solution of alcohol, hot water, and/or both to stop leaks. Three of them are for radiators, three for bicycle tires, and one for steam apparatus. The common knowledge of chemists skilled in the art would plainly indicate the colloidal nature of such substances. The actual application to automobile radiators in the prior patents relieves us of the necessity of considering both the analogous (double) use doctrine referred to above and its narrow phase to be mentioned later. What is the same is naturally obvious. It seems to us to amount to this: An eighth patentee takes one of the substances heretofore used, gives it its true scientific name, and says, "Presto! I have invented something." This would seem to be a curious reversal of the principle (already referred to) that an inventor need not know the scientific theories underlying his invention.

The opinion we have just expressed is, of course dispositive of the case. However, counsel for the plaintiff have argued with such earnestness the three remaining questions that we feel a higher court may be entitled to our views thereon. Counsel seem to feel that two of these questions, namely, the substitution of materials and analogous purpose (double use), should be treated by some method of isolation. In other words, he—perhaps because he feels it necessary, if his contentions are to be maintained—places the purpose and the material of the various patents in separate compartments. So, he argues, the colloids—rye meal, flaxseed, and linseed oil—are used in stopping leaks in radiators, and the colloid, gambier, is used in stopping leaks in bicycle tires. Therefore it is ingenious to use gambier for stopping leaks in radiators. Such reasoning is undoubtedly founded on the theory of novelty and its lack because of anticipation by prior patents. We

submit it has no relevancy when we are concerned with the application of common knowledge and the advance over such prior knowledge necessary to escape the obvious. Once given the problem of leak stoppers in solution, it is clear that a simple transposition among the chemical substances comprising the three factors—i. e., inclosed medium (water, air), inclosure medium (metal, rubber), and sealing composition (flaxseed, gambier, etc.) —is not an invention.

[10] Even upon a narrower view, the court finds plaintiff's position on these two issues untenable. It is unnecessary, of course, to consider any change in the proportion of constituents. It is well settled that such a difference does not constitute invention. Nailcrete Corporation v. Paul Mende, Inc. (C. C. A. 2d) 11 F.(2d) 678. It is perhaps interesting to note that at one time it was felt necessary to prevent such an outcome by including an express provision thereon in the Patent Act. Patent Act 1793 (1 U. S. Stat. at Large, p. 318) § 2.

[11] It is elementary that the substitution of a superior for an inferior material may be judgment in selection and adaptation of materials, and not invention. Hotchkiss v. Greenwood, 11 How. 248, 13 L. Ed. 683; Forchheimer et al. v. Franc, Strohmenger & Cowan (C. C. A. 6th) 20 F.(2d) 553. The cases discuss four of what they refer to as "exceptions" to this principle. We believe it more accurate to style them four "ways" by which we may test generally whether the obvious has been gone beyond. Thus, we are required to ask whether or not the substitution involved a new mode of construction; new properties or uses of the article made (Smith v. Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952), new modes of operations, or new functions (C. & A. Potts & Co. v. Creager, 155 U. S. 597, 15 S. Ct. 194, 39 L. Ed. 275), or, increased efficiency or a decided saving in cost of operation (Hicks v. Kelsey, 18 Wall. 670, 21 L. Ed. 852).

Judge Woolley, in the case of Low v. McMaster (C. C. A. 3d) 266 F. 518, has authoritatively summarized and expounded the general principle and its subordinate rules for this circuit. In the case at bar, very apparently, the only one of the four for which any claim to an affirmative answer may be made is the last. It is, perhaps, difficult to understand exactly how this criterion has crept into the patent law. It seems manifestly to relate more clearly to utility than to invention, and to be open to the same criticism we shall notice in the claim for commercial success. It simply goes to show, at any rate, that in some

respect the patent law is a question of degree. However that may be, it seems to be established by ancient precedent. Dupont v. Dennison Mfg. Co. (D. C. N. D. Ill. E. D.) 18 F.(2d) 317.

The testimony in regard to increased efficiency was most unsatisfactory, and not enough, in our view, to meet the requirements of the law. In every case, of course, the inventor and his employees naturally claim increased effectiveness for their product. Their doing so may well have the sincerity which goes with a pride of creation. Their chemist did not pretend to be a practical man, or to speak with authority on practical problems. We recall no witness, such as automobile manufacturers, drivers, owners, mechanics, garage owners, and the like, who are naturally familiar with the operation of automobiles. Their opinion of the efficiency of different leak-stopping ingredients would be most enlightening.

As well as the substitution of gambier, some reference was made to the substitution of alcohol as a solvent for the solution of both claret and water. Here, again, we detect his separation doctrine; alcohol appearing in two of the patents using colloids other than gambier. It seems unnecessary to us, however, to discuss this question again, or to go into the respective merits of alcohol, either in strong or weak solution (claret), or of water as solvents. Alcohol is without any question one of the earliest known solvents. We find reference to it in the literature of the Egyptians. Annalist, Sept. 1925, p. 448. In the Pharmacopia of the United States for 1907, under the heading "Gambier," appears:

"An extract prepared from the leaves and twigs of purouparia gambier (Hunter). Irregular masses of cubes about 25 mm. in diameter. Crystalline. Inodorous. Very astringent. Not less than 70 per cent, *Should be soluble in alcohol*. When incinerated, gambier should not yield more than .5 of ash." (Italics mine.)

Furthermore, the Handbook of Chemistry and Physics (published annually for many years) contains a complete list of substances, together with their solubility in water, *alcohol*, and ether. Any one familiar with the history of industrial chemistry will also remember that the increased use of alcohol as a solvent was one of the greatest benefits derived from the policy of the German government of 75 years ago in distinguishing between industrial and beverage alcohol for taxing purposes. The investigation and hearing of the congressional committee in 1911, which preceded the passage of our industrial alcohol statutes, are also pertinent. In view of this very common knowledge, we do not imagine that the plaintiff wishes to insist strongly upon his ingenuity in substituting (even if he did so) alcohol for claret.

Time inexorably limits the field of invention. By the same token, the doctrine of analogous purpose assumes increasing importance with the passage thereof. This is amply testified to by the number of cases dealing with this phase of the patent law. The legal principle pertinent to the use, of all materials, contrivances, or any other subject-matter (in the strict statutory and, we think, only correct sense of that phrase) of a patent for a new purpose is ancient and clearly defined. Here again we must be careful not to overlook the fact that we are concerned with only a subordinate application of the general and underlying rule of obviousness so often heretofore referred to.

So the cases talk of "use off the common or beaten track or territory"—Penn v. Bibby, L. R. 1 Equity (Eng.) 548; Metropolitan-Vickers Co. v. British Thomson-Houston Co., 42 P. L. R. (Eng.) 143, 162—and use the adjectives "analogous," "cognate," and "similar." We are all familiar with the nipping lever case—Poyes v. Taunton, 9 Jurist (Eng.) 1956—and with the Lord Chief Baron's trenchant remarks with respect to the use of a spoon in Losh v. Hague, 1 Webster (Eng.) 202. For typical English cases since that time, see Gosnell v. Bishop, 41 Ch. Div. (Eng.) 151; Harwood v. Gt. Northern Ry. Co., 11 H. L. (Eng.) 654; Morgan v. Windover, 4 R. P. C. 417, 7 R. P. C. (Eng.) 131. That judges disagree there also is illustrated by various phases of the cases of American Braided Wire Co. v. Thomson, 44 Ch. Div. (Eng.) 274, 6 R. P. C. (Ct. of Appeal) 518, 7 R. P. C. (House of Lords) 333.

The courts in this country have taken the view of this part of the patent law which is even stricter than that of their English brethren. Some of the principal authorities are learnedly collected in the opinion of Judge Bodine, of this district, in the case of Southern Electro-Chemical Co. v. E. I. Du Pont de Nemours & Co. (D. C. N. J.) 9 F.(2d) 69, reversed on other grounds (C. C. A. 3d) 20 F.(2d) 97. One need only cite the leading case of Brown v. Piper, 91 U. S. 37, 23 L. Ed. 200, wherein the transfer of the use of freezing mixtures to prevent decay of animal matter from the art of embalming to that of cold storage was held to be not invention.

In the principal case it is not contended that there are any difficulties to be overcome in adapting gambier for use with metal

rather than with rubber. See Gadd & Mason v. City of Manchester, 9 R. P. C. (Eng.) 249, 516. The invention, if any, therefore, must lie exclusively in the use.

The fallacy in the plaintiff's argument under this head seems to us to lie in his change of emphasis. Heretofore he has stressed the advantages of gambier as a colloid and in the colloidal state. We have seen that the advantages, and therefore the use or purpose, are the same when the dispersion medium is air rather than water. The dispersed phase in both cases is, of course, gambier.

It is not necessary, therefore, to consider any differences the substance may have in regard to its ability to exclude air or water, as a matter of fact, to attempt to do so involves again some nice questions of chemistry. Whether a substance is more or less porous to air, or resistant to or impermeable by water, would seem to depend on the laws governing molecular activity of gases and the solubility of matter and a comparison between them. If, even on the scientific side, the two uses of the same material are analogous, clearly, a fortiori, on the practical side, the same is true.

Finally, the plaintiff seeks to establish invention by evidence of what has been variously referred to in the courts as "commercial success," "extensive use," or "long-felt want." That he, as well as other inventors, should do so seems to us the inevitable outcome of the encouragement given to such a position by the courts. Since the Supreme Court's pronouncement in Washburn & Moen Mfg. Co. v. Beat 'Em-All Barbed Wire Co., 143 U. S. 275, 12 S. Ct. 443, 450, 36 L. Ed. 154 (the barbed wire patent), there seems to this court at least an increasing tendency to give this doctrine a predominant position in the decision of a case.

If we could do so without being presumptuous, we should like at some time to make an analysis of the principle which these phrases describe. Although it seems to have been generally treated as a doctrine of substantive law, it seems to us to belong rather properly to the law of evidence—the adjective law. In other words, the fact that the subject of the patent was "not sooner adapted and used, and that it did not occur in this light even to the most skillful person, is evidential on the question of obviousness." Webster Loom Co. v. Higgins, 105 U. S. 580, 591 (26 L. Ed. 1177). Considered, then, as evidence, it may be that the courts should apply thereto the principle already embodied in their rule in respect to collateral issues generally.

So far as we have been able to ascertain,

this theory was first put forward in the opinion of the Supreme Court in the case of Smith v. Vulcanite Co., supra, decided in 1876, or almost 100 years after the passage of the first Patent Act. The learned court in that case quotes from Webster on Patents. This text-book seems to be a pamphlet written by one Thomas Webster in the year 1841, and an even cursory reading of the cases cited in the footnotes thereof (Hulbit v. Hague, 2 B. & A. [Eng.] 320; Brunton v. Hawkes, 4 B. & A. [Eng.] 541) clearly indicates that the opinions of the judges in no way justify its text. Furthermore, in recent years it seems to have been forgotten that the Supreme Court materially qualified its own rule shortly after its pronouncement. So it was said in the case of McClain v. Ortmayer, 141 U. S. 419, 428, 12 S. Ct. 76, 79 (35 L. Ed. 800):

"That the extent to which a patented device has gone into use is an unsafe criterion, even of its actual utility, is evident from the fact that the general introduction of manufactured articles is as often affected by extensive and judicious advertising, activity in putting the goods upon the market, and large commissions to dealers, as by the intrinsic merit of the articles themselves. * * * If the generality of sales were made the test of patentability, it would result that a person, by securing a patent upon some trifling variation from previously known methods might, by energy in pushing sales or by superiority in finishing or decorating his goods, drive competitors out of the market and secure a practical monopoly, without in fact having made the slightest contribution of value to the useful arts. * * * While this court has held in a number of cases * * * that in a doubtful case the fact that a patented article had gone into general use is evidence of its utility, it is not conclusive even of that, much less of its patentable novelty."

[12] However that may be, it is our opinion that this doctrine has no application to the principal suit. This for four reasons: In the first place, the courts are unanimous in holding that they can be resorted to only when the other facts leave the question of invention in doubt. Consolidated Safety Valve Co. v. Crosby Steam Gage & Valve Co., 113 U. S. 157, 5 S. Ct. 513, 28 L. Ed. 939 (safety valve case); Krementz v. Cottle Co., 148 U. S. 556, 13 S. Ct. 719, 37 L. Ed. 558 (collar button case); Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527. We have, we hope, made it clear that the facts in the principal case have raised no such doubt in our mind.

[13] In the second place, although we do not

stress it, we do not find the evidence of the extent of the user convincing. It has been held that not a large number, but a large majority, of users must be shown before commercial success can be accepted as raising any presumption. Insulating & Refrigerating Co. v. Anderson, 41 R. P. C. (Eng.) 25. And in Sperry Mfg. Co. v. J. L. Owens Co. (C. C. A. 8th) 111 F. 388, the court said: "Neither of these witnesses furnishes any data to show the proportion of their machines sold to all the machines sold." It seems to us that the testimony of the inventor, his agents, and his assignee, is subject to these or similar criticisms.

[14] Finally, the logic of a rule addressed to the objection of obviousness requires a demand both of duration and spontaneity. Some of our cases refer generally to the length of the period during which the need is felt. The English authorities, we think, emphasize more clearly the reasons therefor. Thus, in Lyon v. Goddard, 10 R. P. C. (Eng.) 337, the court said: "It may be inferred, from the *length of time* during which the demand remained unsatisfied, there must have been some obstacle which the inventor by his ingenuity was able to surmount." (Italics mine.)

Mr. Justice Romer, in Bowen v. E. J. Pearson & Sons, Ld., 42 R. P. C. (Eng.) 101, 108, has this to say: "The present case is not one of those where the patentee has succeeded *at last in supplying a felt want*. In such cases the fact that the patentee has succeeded where others have failed is some evidence, and often cogent evidence, of the exercise of inventive ingenuity. Such cases are referred to by Lord Shaw in Bonnard v. London General Omnibus Company, [1921] 38 R. P. C. 1, at page 14): 'The whole question is purely one of law, and is confined to the point whether this patent contains patentable subject-matter. In considering that question— a question of law—it is legitimate no doubt to take into account the previous efforts to find a supply for a felt want. In the ordinary cases which arise in the courts of law that process is given in evidence with some elaboration, namely, for example, long search, possibly attempts which fail, in many cases applications for patents which are found to be unavailing, and a whole review of these things is exhibited in evidence, these experiments and searches sometimes extending to many periods of years.' Nothing of that sort exists here. The plaintiff's wristlet has no doubt enjoyed a considerable sale since the war ended. But the present one appears to be a case where the *supply has created the demand*, and not one where the demand created the supply."

In the principal case, the testimony in respect to both the need and attempts to satisfy that need, for boiler and radiator leak-stopping devices is most meager. There seems to be none at all in respect to boilers, and, in respect to automobiles, it is practically confined to the statement that radiators have existed since the discovery of automobiles and that such water-cooling devices leak. It may be that the industrial futility of stopping leaks by such temporary means accounts for the absence of any demand.

Of course, if the demand is not spontaneous, but is attributable to anything except a need for the subject-matter, the courts are unanimous in holding evidence of such demand not relevant. Peoria Target Co. v. Cleveland Target Co. (C. C. N. D. Ohio, E. D.) 47 F. 725 (energetic business management); Dueber Watch-Case Mfg. Co. v. Robbins (C. C. A. 6th) 75 F. 17 (connection with another device). Also, the courts have declared that "that something else" may be the power of advertising. In Consolidated Car Heating Co. v. American Electric Heating Corp. (C. C. Mass.) 82 F. 993, we find this language: "The respondents suggest that this is largely, if not entirely, due to artful advertising on the part of the complainant; indeed so artful as to be to some extent, fraudulent. A suggestion of this character would have great force with reference to an article sold to the public at large."

And also Lord Shaw, in Barnard v. London Omnibus Co., 39 R. P. C. (Eng.) 1, 14: "The argument drawn from the commercial success of a patented article is not always to be relied on. Other causes, such as the enterprise of the vendors and the resort to lavish expenditure in advertising, may cooperate to promote a large marketable demand. Extensive use is only an element to be considered in a case where patent and invention are doubtful. Where, as here, the extended use can be attributed to something other than the mere novelty of the device, it loses its *evidential* force."

See Belais v. Goldsmith Bros. Smelting & Refining Co. (C. C. A. 2d) 10 F.(2d) 673; Stedman v. Puritan Rubber Co. (D. C. N. J.) 11 F.(2d) 278, 281; Wolf Mineral Process Corp. v. Minerals Separation North American Corp. (C. C. A. 4th) 18 F.(2d) 483.

It appears from the testimony of the witness Tolfree (the real plaintiff, so to speak) that since 1917 he has spent three-quarters of a million dollars in advertising "X" Liq-

uid. At the present time he is spending $100,000 a year for the same commendable purpose. Some of these advertisements were offered in evidence as Exhibits P–11a to P–11g, inclusive. We have never made any study of the theory and practice of advertising (one of our national sciences), and of course the fact of such advertising should not be taken to destroy a patent. These sums seemed, however, to us to make equally probable the hypothesis that the commercial success of plaintiff's product is due rather to expenditure in advertising the same than to its intrinsic ingenuity.

The length of this opinion makes it not inappropriate to state in conclusion the writer's own conviction as to the judicial function in this respect. Canon 19 of the Canons of Judicial Ethics of the American Bar Association reads as follows:

"In disposing of controverted cases, a judge should indicate the reasons for his action in an opinion showing that he has not disregarded or overlooked serious arguments of counsel. He thus shows his full understanding of the case, avoids the suspicion of arbitrary conclusion, promotes confidence in his intellectual integrity, and may contribute useful precedent to the growth of the law."

It is our humble judgment, however, that this sound and well-expressed principle requires amplification. The attempt to comply with its terms has a tendency to place judges upon the horns of a dilemma prejudicial to the proper administration of justice. On the one hand, the actual decision of the case is either postponed until the judge has an opportunity to clothe his thoughts in the careful and formal language of an opinion; or, on the other hand, the wholesome pressure to decide cases promptly, coupled with a supposed necessity for an opinion in all cases, leads to, we think, the filing and printing of judicial utterances the material for which must of necessity be furnished largely by the efforts of counsel. And see the views of Mr. Justice Brandeis in Virginia Ry. v. United States, 272 U. S. 658, 47 S. Ct. 222, 71 L. Ed. 463.

It is agreed that some method restricting the stupendous output of our legal literature is desirable. To those who are concerned in the present discussion of this question, a lecture delivered by the late Judge Dillon, at Yale University, in 1894, entitled, "Our Law, Its Huge Bulk, and the Remedies Therefor," and based upon a report made to the American Bar Association in 1884 by the same distinguished jurist, is not without interest. A partial solution of the problem would seem to us to be a prompt decision—i. e., filing of final orders—followed by the more leisurely preparation of a formal opinion in the increasingly limited number of cases in which one seems necessary. So, at least, we think, justice would approach the desirable criterion of speed, and the pronouncements of our courts would be both less numerous, and, however limited by the human frailties of the individual, at least the result of an original research.

The bill will be dismissed.